## JACOWAY, admx., v. DENTON.

CONTRACTS FOR SALE OF SLAVES—*their obligation can not be impaired by a State.* Section 14, article XV., of the Constitution of 1868, relating to slave contracts, is repugnant to section 10, article I., of the national Constitution, relating to the obligation of contracts, and is unconstitutional and void.

The State Convention cut off all remedy on such contracts, and thereby impaired the obligation of them.

The State courts, under the Constitution of 1868, have *jurisdiction* to enforce contracts based upon the sale of slaves.

It is not unlawful for the representatives of the obligor, in a contract made in this State, in 1860, to pay the price of *slaves* purchased, to perform the same.

The rule that one party to a contract can not be bound unless the other is, does not apply to such a contract, although the slaves are subsequently emancipated by the Government.

The prohibition of the national Constitution is placed upon the State in its sovereign capacity, and embraces within its purview the action of the people assembled in Convention, as well as the acts of the Legislature.

Every contract necessarily refers to the laws in existence when and where it is made, and its obligation must be determined by those laws.

A contract made in 1860, and *permitted* by the Constitution of 1836, then in force, can not be *impaired* by the Constitution of 1868.

NATURE OF SLAVERY AND SLAVE CONTRACTS—*breach of covenant.* This court does not recognize any legal distinction between contracts for the sale of slaves and contracts relating to any other subject-matter.

Slavery was sanctioned by the custom of ages; confirmed by law; sustained by the purest courts of the country, and supported by the power of the nation.

Slavery was not the creature of statute law. It was entailed upon our nation at its birth. It was the error of past ages.

The purchaser of slaves took them subject to contingencies in their status that might arise from accident, death, act of Government, or of God, none of which would constitute a *breach* of the seller's covenant, that they were *slaves for life*.

The State, acting in its sovereign capacity in Convention, could prohibit the enforcement of *future* contracts, resting upon the sale or purchase of slaves.

EMANCIPATION. The proclamation of emancipation was valid and effective as far as the Government forces could execute it.

During the rebellion, and as a war measure, the General Government had the *right* to liberate all those slaves of rebels which were embraced within her military lines.

40

The slaves of the rebels in this State were not freed by the amendments of the national Constitution, or by the provisions of the Constitution of the State, but by the war measures of the Government.

*Appeal from Yell Circuit Court.*

Hon. WILLIAM N. MAY, Circuit Judge.

GARLAND & NASH, and CRAVENS and JACOWAY, for appellant.

H. F. THOMASON, for appellee.

GREGG, J.

The appellee brought an action of debt against W. D. Jacoway, as the administrator of Benjamin J. Jacoway, deceased, on a lost writing obligatory for $4,500, with interest thereon at ten per cent. from the 4th of October, 1861.

The defendant, in the court below, filed two special pleas, and after his removal as administrator, and the appellant's appointment as his successor, she filed one special plea; to all of which pleas the appellee interposed a demurrer, which, by consent, was entered in short upon the record.

The first plea was, in substance: that the obligation sued upon was given in Arkansas, for three negro boys; that the appellee covenanted with the deceased that said boys were all slaves for life; that they were sound in body and mind, and that his title to them was good; that, by the adoption of the Constitution of 1862, for this State, said boys, while living, all became free, and no compensation was paid for them, and therefore the appellee's covenant was broken, the consideration for said writing obligatory failed, and he was not bound to pay off the same.

The second plea sets up a like agreement, and avers that, by the adoption and ratification of an amendment to the Constitution of the United States, the negro boys became free, with the same conclusion as the first plea.

The third plea sets up that the writing obligatory, sued

upon, was given in said State, for the purchase price of three slaves sold by appellee to appellant's intestate, and therefore it is null and void; and she prays judgment, that the court take no cognizance of the case, &c.

The court sustained the demurrer to all the pleas; the appellant rested; final judgment was rendered for the appellee for $7,912, to bear interest at the rate of ten per cent.; from which judgment the appeal to this court is prosecuted.

It may be borne in mind, in the discussion of the questions presented in this case, that at the time this contract was entered into, (October, 1860,) it is conceded by all parties that negro slaves, under the laws of Arkansas, were property; that the owners of such property had then a legal right to sell and convey the same, and that a sale and delivery, under the laws then in force, was a sufficient and valid consideration for a writing obligatory or other promise to pay; that the contract in this case, when made between the parties, was legal and binding, and, under the then Constitution and laws of the State, could have been enforced.

These facts being understood, we will proceed to discuss the sufficiency of the defendant's pleas.

It is insisted that the contract, though valid between the parties when made, has become nugatory; that the consideration has failed, and such contracts have been made unlawful.

It is argued, in support of the first plea, that the Constitutional Convention of 1864 had the power, and did liberate all slaves within the State, and the destruction of all property in the slaves, without fault of the obligor, was a breach of the obligee's warranty that they were slaves for life; and, after such failure of consideration, an action can not be maintained.

For the second plea the same argument is presented, only it bases the slaves' freedom upon the amendment of the United States Constitution.

None question the fact that all slaves in the State have been emancipated and forever made free, but lawyers and courts do not so well agree as to the sovereign act which gave them freedom.

The slave, in one sense, was property—the mere chattel interest of his master; in another, he was a person—a free agent—while the master was entitled to the services of him and his offspring forever, and could sell and transfer them at will; yet he was, to an extent, recognized as an intelligent human being, held responsible to and protected by the law. He was a person and property, and capable of being acted upon by law in either capacity, and therefore was entitled to a position before the law that could not be claimed for property that was purely chattels, and we are not prepared to say the sovereign will of the people, acting upon his higher and personal status, might not have conferred upon him the privileges of a citizen, and placed him beyond the control of the property owner.

We deem it not necessary, now, to discuss the power of sovereignty, of State or nation, to liberate the slave, by acting upon his personal relationship to society. Be that power what it may, it was as well known to Jacoway as to Denton, and he then took such property with its status, as the same was well understood before the law; and contingencies arising thereafter, from accident, death, act of Government, or of God, were matters for his consideration at the time he executed the contract, and not controlled by such contingencies in the future. See *Grace v. Dorris*, 24 *Ark.*, 326 ; *Haskill v. Sevier*, 25 *Ark.*, 152.

When the people of the slaveholding States, in 1861, entered into a combination with the intent and for the purpose of throwing off their allegiance to the Federal Government, and setting up and maintaining an independent government for themselves, and to this end put on the paraphernalia, and assumed the responsibilities of open, hostile war, they then lost all the protection of citizens under the Constitution and Government of the United States, became public enemies of that Government, and were liable to all the deprivations and penalties consequent upon a state of war.

Having thus asserted their independence, declared their allegiance dissolved, and their right to maintain a separate hostile

government by force of arms, they then fully assumed all the risks and consequences of existing war and its results.

Under these circumstances it was legitimate and proper for the Federal Government to move an armed force upon such rebellious States and pretended government, and, by physical strength, compel them to hear her mandates.   In the exercise of such force, she was not to look to the rules laid down in her Constitution for her guidance between herself and peaceful States, which were performing all their duties towards the central government, but she, of necessity, was to be governed by the laws of war.   She had to grant rebels the rights of war, and she could justly impose upon them the burdens, pains and penalties of war.   Among these were the right to destroy their armed forces; to take and hold the territory they occupied; to confiscate their property; to levy duties upon their citizens under her control, or to seize their property and effects for temporary or permanent government use; and such captures, in war, not only deprive the former owner of the use of his property, but, by well understood laws, forever extinguish his title.   Another important consequence, assumed by all States engaging in war, is, that the conquering power has the lawful right to determine and fix the conditions of returning peace.

The proclamation of the President of the United States, declaring all slaves in the rebel States emancipated from the first day of January, 1863, was an important act in the war. Whether or not it was effective throughout the rebel States, as a war measure, it was certainly valid as far as the Government forces could execute it.   It was direct authority to the armies of the Union to make free all such slaves as might be by them captured.

All property of rebels, captured by the army, as soon as secure, became vested in the Government; and, when brought within her military lines, she could, with the utmost propriety, liberate slaves, muster them into her armies, or make any other disposition of them approved by humanity, and by her deemed best.

When the rebellious armies and civil authorities of this Confederacy had to acknowledge the superior force and right of the Federal Government, by the laws of war the will of the conqueror, the rules established for her armies, the mandate of the commander, was the law then, until other regulations could be properly made, and they could only be had under the direction of the triumphant government. Consequently, as a war measure, the Government had a legal right to seize this property, and to dispose of it as she saw fit. She exercised that right, and, through her Chief Executive, made known her intention by public proclamation ; and to this end her agents, the officers and soldiers in the field, issued orders that all such persons as had been and were held in slavery, be forever made free ; and at once, through such agents, her armies, she proceeded to carry out said proclamation ; and, as fast as they advanced, took possession of the territory, and extended protection to the colored men, they became unconditionally free. When the Confederate armies were overpowered, and threw down their arms, the entire territory and population of the rebellious States at once passed under the military power and control of the armies of the Government, and all the people and property in such States became subject to their will and authority, and all slaves, not before that time liberated, at once, *ipso facto*, became absolutely and forever free.

The better to secure the just execution of the laws of the Government, and the faithful recognition of the newly acquired rights of these people, and as terms for peace and protection to the conquered soldiers, the oath of amnesty was tendered the returning rebels, requiring their allegiance to the Government, and their most solemn pledge to maintain the rights of the freedmen. The slaves being free, to take all rights of that institution from the States and their laws, and bar future attempts to reëstablish it, the Constitution of the United States was amended, and the late rebellious States adopted new organic laws, prohibiting slavery or involuntary servitude (except for crime) for all time to come.

We are therefore of the opinion that the former slave does not trace his freedom to the amendments of the Constitution of the United States, or the enactments in the Constitution of the State of Arkansas, but to the sovereign will of the nation, in the assertion of her rights and privileges during active war, manifested by her proclamations and carried into effect by her armies, under the laws of war, and assented to by her enemies in their terms of peace. To this result, and these settled principles of policy, the organic and other laws readily conformed.

The third plea is a direct allegation that the writing obligatory, sued upon, was given for slaves; and avers that, under the Constitution of 1868, of this State, it has become null and void, and the courts of the State can not take cognizance in the suit.

We feel that this presents a question of great importance, if not of much doubt. The late Convention not only declared slavery forever abolished, but attached other rights growing out of that institution, and enacted that contracts for slaves shall be held null and void.

This unmistakably demands of us to pass upon the powers of an important department of government, a task unusually difficult; and, of all others, the most delicate that can come before a court. We hesitate when a question is presented with an apparent well founded constitutional objection to the action of a Legislature, and so much more do we feel to shrink from the responsibility of declaring whether or not the deliberate action of the sovereignty of a State, in Convention assembled, is or is not in conformity to or in violation of the natural and inalienable rights of a citizen of such State, or of the fundamental law of the nation. But the delicacy of the task, the importance and effect of the issue, the consciousness of the want of the high attainments for such solution, are no sufficient excuse, when the question requires an answer of this court; and, therefore, we will declare our convictions of the law from the very best lights that are before us.

Section 14, article XV., of our Constitution of 1868, enacts

that "all contracts for the sale or purchase of slaves are null and void, and no court of this State shall take cognizance of any suit founded on such contracts; nor shall any amount ever be collected or recovered on any judgment or decree which shall have been, or which hereafter may be, rendered on account of any such contract or obligation, on any pretext, legal or otherwise."

Under the well understood rule that legislative acts should never have a retrospective construction, if they admit of any other, we could hold the first clause of this section operative only upon the future conduct of men; but the language used in the remaining part of the section is clearly retrospective, and shows beyond doubt that the Convention intended to cut off all remedy, in the courts of the State, upon all preëxisting as well as future obligations and contracts based upon the consideration of slave property. The clauses in this section that beyond doubt are retrospective form a clear index to the true meaning of the entire paragraph, and irresistibly brings us to the conclusion that the whole section was to have such retroaction, and we prefer to meet these grave questions upon a fair and legitimate construction of these clauses in our Constitution, upon a just definition of what was the meaning and intention of the Convention, rather than try to quiet our consciences and avoid responsibility by some strained construction to show that it means a thing that never entered the mind of a single delegate in that Convention.

Then we assume that the Convention did intend, and by the section referred to did enact and declare, that both past and future obligations and contracts, resting upon the sale or purchase of slaves, should be held null and void, and that no court should take cognizance of or enforce any such obligation. Had the State Convention power to annul these existing contracts? All concede she could prohibit the enforcement of such future contracts; that, when assembled in her sovereign capacity, she was perfectly competent to decide upon future public policy within her limits, and to prohibit or encourage

any kind of business or class of dealings she might deem for the best interest of the people, regulated only by natural justice and the Constitution of the United States.

Before going into a full discussion of the legislative powers of a State, it may be well to notice what some consider a marked distinction between contracts growing out of transactions in slave property and those arising upon dealings in ordinary goods and chattels. The former are charged with being wrong in themselves; not that they were in violation of the laws of the land; not that they were criminal *mala in se*, or *mala prohibita;* but they are said to have been contrary to natural right, immoral, and therefore tainted with wrong, and of less binding force and effect than other civil obligations.

We must say, as a court, we can not see the legal force of the distinction. As a moralist, a religionist, or as an individual member of society, we may seriously condemn slavery, and every circumstance and incident attendant upon it; we may feel the just censure and guilt that rests upon our State and nation for so long maintaining such an institution, and from the depths of our consciences wish to charge the offense back more than behind the third or fourth generation. Yet, as lawyers, we can but view the rights of individual members of society as the law-making powers have declared or long suffered them to exist, and as judges we can not expound the laws according to our own views of ethics, or our own code of morals; we can not declare that which ought to have been but was not enacted, to be law; but that which emanated from the will and properly regulated action of the legislative department, we must utter as the correct rule of action—as the law unto the people.

Binding children out as apprentices is now right, because it is law. It is said to be for their good; that the master will care for and protect his servant. Should public sentiment change, and better provision be made for the poor, and acts placing children of the State under bonds of indenture to serve a master for fifteen or twenty long years, by law be declared a restraint upon

natural liberty, and an involuntary servitude for that great number of years, and a crime against the law, then courts would adjudge apprenticeships against public policy, a restraint upon natural rights, contrary to law, and void. But no objections which we may now have to placing a bright child for years under a master will allow us to adjudge against such act; and, under our system of government, can a change in policy and future legislative action come back and make void what we are lawfully doing now ? Public policy is but the manifested will of the State, and the question is, whether by a change in her will or policy, under our national Constitution, she can destroy a *contract* made under and sanctioned by her former policy.

The mind of the people, the deepest convictions of right and wrong, depend much upon education, as well as upon an innate sense of duty to men and God. What was just, right and religious, with the purest christianity, of some communities and some ages, by others, equally intelligent, was regarded the most devilish of all earthly crimes. And, while we have attained a higher civilization than has blessed any other people, we are not to perfection. An age in the future may as deeply censure some of our present lawful practices as we now do that which has been termed " the legalized crime of the past."

The appeals of the right and wrong must go to the political departments of the Government, to be there acted upon. Citizens need only conform to those acts, and the courts, under the national Constitution, are to protect rights as they have accrued under existing laws. Any contract properly sanctioned by the law-making power of a State, it matters not how defective in policy, how repugnant to our sense of moral justice, we can have no discretion in according to each one what the law has granted him as a right.

Under the oath of judges they must support the Constitution and administer the law, and when Constitutions and laws say a thing is right, courts dare not say it is wrong. When that authority allowed slavery as a right, no court could adjudge censure or crime against one who dealt therein.

The sentiment of natural injustice to holding man in perpetual bondage has rapidly grown under modern civilization, and, in our country, become so intensified under the heat and protracted excitement of unparalleled war, that we can not expect men so soon to look calmly and dispassionately upon that institution and the rights that legally and equitably grow out of it.

When we see that the slave's freedom was born in that terrible clash of arms, we may readily account for the fog and smoke that beclouds so many minds, when attempting to explain the peculiar institution of slavery, and the incidents naturally and legally growing out of the same.

Some men seem yet not to appreciate that our colored people are free. Others can not recognize the fact that they ever were slaves. With such evidences of remaining passion, can we expect extremists on either side to properly discern and appreciate property rights growing out of the institution of slavery?

Notwithstanding the very general notion, the conceded proposition, that legal rights and legal wrongs have always been based upon the customs of men and the declared will of the State, some do violence to every principle of law and argue that slavery was always a crime, though sanctioned by the custom of ages, confirmed by law, adjudged by the ablest and purest courts of the country, and supported by the power of the nation; yet they say it tainted and destroyed all contracts. The opposing zealots, with like pretended earnestness, say they had a property right in their slaves; that it was an inalienable right; that the whole sovereignty of the Government could not lawfully deprive them of such right; that the negroes are still their slaves, and that it is only illegal force which prevents them controlling them as property.

To such as have no comprehension of the powers and results of war, or the true basis of our Government and the nature of the political rights of her citizens, no one can expect to furnish a satisfactory conclusion. We must leave the field of so

refined ethics, and avoid the mire of such bitter, blinded prejudice; we must take clear and tenable ground; we must act as rational men; we must accept the law as it was and now is with imperfections; we must examine slavery as it was; we must consider the nation, the State and the people as they were, not as we think they should have been; and in this view only can we arrive at a correct conclusion and duly appreciate the rights of the parties to this suit.

When scrupulous as to slavery and its consequences, we must take comfort that it was not the creature of statute law, for which we or our immediate ancestors are responsible. It was entailed upon our nation at her birth; it grew up as she grew; it was the error of that age and of past ages; it was regulated and sustained by State statutes, but not so created; it was sanctioned by the people, and by their common consent it was made law, and that law allowed contracts to be made concerning slaves as property, as chattels, and that which was sanctioned by constitutional law the courts found to be right, and that which was against such law they always adjudged to be wrong.

One further observation: In speaking of the power of the Government over private rights, we may be understood as referring to rights generally, and not to those well known exceptions—such as the taking of private property for public use, or the forcible taking, using or destroying private property under the necessities of active war, &c. Where vast interests of large communities are at stake, private claims must give way to public necessities; and such cases are provided for in an exception to the general rule laid down in the fundamental laws of the Government.

Then, to the argument against this recovery:

1. It is argued that, upon an agreement to perform an act which becomes unlawful to do, the obligor is excused. Be that true, it is in no way applicable to the case at bar. Jacoway executed his writing obligatory, by which he was to pay $4,500 and interest. It is certainly not unlawful for his repre-

sentatives to pay off his written obligation, and hence not a parallel case to those cited.

It is also said a contract must be mutual, and if one part fails, the whole must fall; that one party can not be bound and not the other. That is no more applicable than the other proposition. Denton was not hindered or excused by law from performing his part of the contract. He had title to certain property, which, by mutual agreement, he sold, bill of saled and delivered to Jacoway. The whole understanding was completed. The contract on his part was fully complied with; nothing remained but for Jacoway to pay him the sum agreed upon.

This contract, when entered into, (October, 1860,) was but an ordinary, valid agreement, under the laws of the State of Arkansas, and the consideration for the writing obligatory was ample. Denton, under the contract, had an unquestioned, plain, vested property right in that obligation, and this presents the distinct simple question, can he by any State authority be divested of that right without fault of his or public necessity.

We are told the United States Constitution leaves it within the power of States, within their respective limits, to destroy vested rights, and to do so can only bring censure and condemnation upon such legislative act, but that it can not be set aside for want of power.

Grant that the national organic law, for objects worthy of so great latitude, does allow such arbitrary power to a State, the taking of a citizen's property for the mere purpose of its destruction, or the taking of one man's property and turning it over to another, would be outrages of singular enormity. No one could ever expect or fear State insanity and degradation that would procure such results. There might be danger of private citizens being divested of property for pretended public use. Here the national Constitution interposes and declares it shall not be done without just compensation.

But, in the frequent crashes and wonderful fluctuations in commerce, seeming necessities arise for a change in existing

agreements, and the powerful influence of vast moneyed associations might possibly reach some fallible legislative body, where contracts and rights would be swept from the humbler, if not more honest, portion of society. Hence our fundamental law interposes and declares: "No State shall pass a law impairing the obligation of a contract."

If we knew nothing of the force of combined commercial and moneyed interests, and the plausibility that could at times be shown for a legislative change in contracts; if we knew nothing of the history of this provision in the Federal Constitution, and of the stupendous outrages imposed upon individuals and classes of individuals, by legislative changes, upon existing contracts, when these States were independent colonies, with no limit upon their power; if we knew nothing of the war of 1776 and its consequences, the disregard had for private contracts, compared with what was deemed public interests, we might wonder that our legislative bodies try to hasten every interest into the channel of improved public policy. Such is natural, and that natural proclivity called forth this constitutional barrier between the public will and individual contracts and rights. But we need not stop to reason in favor of this wise provision. It is enough for us to know that our proposition is within its intent and meaning.

This State constitutional provision does not take from our courts jurisdiction in actions of debt, or of contracts generally; but, where it appears the consideration was a certain kind of property, no cognizance shall be taken or recovery had. The very language of the Constitution acknowledges this to be a contract, recognizes the obligation, and then declares it null and void.

Jacoway's third plea accords with this clause, and does not question the jurisdiction of the courts to try matters of contract. Jurisdiction can be properly taken—the parties, the subject matter, the whole case comes regularly before the court—but a fact, in evidence, discloses the consideration, and then, and not till then, we are commanded to stop. It is not,

therefore, for want of jurisdiction in such causes, nor for original illegality in the contract, or wrong on the part of Denton, but solely and entirely upon the single, striking declaration of the Convention, that existing slave contracts are annulled and made void. Could they divest Denton of his right to recover upon an existing contract?

In that clause of the United States Constitution, partially above quoted, section 10, article 1, it is declared: "No State shall * * * make any thing but gold and silver coin a legal tender in payment of debts, pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

It will be observed, in limiting the powers of these local or State Governments, the Constitution does not declare an inhibition against ordinary legislative assemblies, but declares *no State shall impair such obligation.* This injunction is to the sovereignty. The whole people, in any capacity or for any purpose assembled, can not constitute more than *the State.* Such assemblage is but the sovereign power of the State, and of necessity can not be more or greater than *the State;* and, therefore, the prohibition is to the sovereignty. The prohibition goes to the power of a State, and not to the manner or character of her action.

In opposition it is urged that the State has sovereignty within herself, and that so far as her people are concerned, and her internal affairs and business are to be controlled and regulated, she is independent and all powerful. Upon this too great assumption of State rights and State power rested some of the weightiest and most disastrous errors of the present generation.

While our institutions and Government are largely democratic, it is a great mistake of its true character and foundation to suppose that all power is left in the hands of the people of a State; that their will is absolutely supreme over all the persons and property within such State, and that a majority, when assembled in person or by delegates in convention, is to or can unconditionally control all existing and future rights of property within such limits.

This doctrine, we think, is made clear by the Constitution of

the United States in these general declarations of inalienable rights: Paragraph 2, of article 6, declares: " This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made under the authority of the United States, shall be the supreme law of the land ; and the judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to *the* contrary notwithstanding."

And the next paragraph declares, that " all judicial officers * * * of the United States and the several States shall be bound by oath to support this Constitution," &c.

Thus, after declaring the United States Constitution the supreme law of the land, the judges of all the States are declared bound thereby, without regard to their own *State Constitution or laws.* Then, can there be any thing clearer than that it was a fundamental principle, in the formation of our national organic law, that it was the very groundwork of our system, to place some restriction upon all law-making powers, less than the whole people of the Federal Government.

Our Territorial Government was organized under that Constitution. Our first and all valid subsequent constitutions have been formed under and in obedience to that, and with the well understood principle that our Constitution and laws must conform to those of the General Government, and with the express stipulation that our officers must take an oath to support that Constitution, and that it was and is paramount, notwithstanding any provision that might be made in our State Constitution or laws. We then feel that our obligations and duty are plain, if we are fully convinced that there is a conflict between the Constitution of the United States and the Constitution or laws of our own State.

It is argued that there may be a violation of a contract, yet the State courts are prohibited, by the very power that created those courts, from inquiring into that question ; that so soon as they ascertain the contract is based upon slave property, as a consideration, the jurisdiction ceases, because the power that

gave the courts their life has declared they shall not adjudge the rights of the parties after such facts appear. This is but shifting the original proposition. If the Convention cut off all remedy, no jurist would say they had not impaired the right. *Riggs v. Martin*, 5 *Ark.*, 506; *Bennett v. Dawson*, 18 *Ark.*, 337; *Leach v. Smith and wife*, 25 *Ark.*, 246; *Bronson v. Kenzie*, 1 *How.*, 311; *Green v. Biddle*, 8 *Wheat.*, 1 and 75.

If no State court can take jurisdiction between citizens of the State, there is no tribunal that can hear such complaints, and the parties are deprived of all rights in such contract, and hence the same question arises, could the Convention divest them of such rights?

In speaking of the protection of rights, and acts impairing the obligation of contracts, in 24 *Ark.*, 320, Chief Justice WALKER says: " Nor are these restrictions upon the State to be evaded or overridden by any claim of omnipotence by a Convention. In this respect, like a State Legislature, it is subordinate to the Constitution of the United States."

In the case of *Sturgess v. Crowninshield*, 4 *Wheat.*, 206, which was a proceeding attacking a State act of bankruptcy, the Supreme Court of the United States, through Chief Justice MARSHALL, says: " The Convention appears to have intended to establish the great principle that contracts should be inviolable. The Constitution, therefore, declares that no State shall pass any law impairing the obligation of contracts."

In an earlier paragraph of the same opinion, the court says: " A contract is an agreement in which a party undertakes to do or not to do a particular thing. The law binds him to perform his undertakings, and this is of course the obligation of his contract. In the case at bar, the defendant has given his promissory note to pay the plaintiff a sum of money, on or before a certain day. The contract binds him to pay that sum on that day, and this is its obligation. Any law which releases a part of the obligation must, in the literal sense of the word, impair it; much more must a law impair it which makes it totally invalid and entirely discharges it."

Jacoway's third plea admits the making of the contract, but avers that since then the State, through her Convention, has made it void and of no effect. The national Constitution says she shall not impair the obligation of a contract. The Supreme Court of the nation, through her chief justice, declares that any law releasing a part of an obligation impairs it, and much more must a law impair a contract if it makes it totally invalid. Yet in this case we are urged to declare Jacoway's obligation invalid and utterly void.

In the case of *McCracken v. Hayward*, 2 *How.*, 612, in which the validity of a law of Illinois, requiring property taken in execution to be appraised, and to bring two-thirds of its appraised value, was questioned, the United States Supreme Court says of the law, as operating upon contracts: " In placing the obligation of contracts under the protection of the Constitution, its framers looked to the essentials of the contract more than to the forms and modes of proceeding by which it was to be carried into execution, annulling all State legislation. It was left to the States to prescribe and shape the remedy to enforce it. The obligation of a contract consists in its binding force on the party who makes it. *This depends upon the laws in existence when it is made.* These are *necessarily referred to in all contracts*, and *forming a part of them*, as the measure of the obligation to perform them by one party, and the right acquired by the other."

How emphatically that court says the contract must be judged of by the laws existing when it was made. They say these laws are referred to, and they form a part of the contract, and the obligation and rights of the respective parties must be determined by these laws. There is no question as to the rights of Denton, or the duties of Jacoway, under the laws in force when this contract was made.

The Chief Justice of Kentucky, in *Blain v. Williams*, 4 *Littell*, 38, says: "The legal obligation of a contract evidently consists in the remedy to enforce it. If the remedy be withheld, or taken away, the contract has no legal obligation."

And he proceeds to declare a law, extending the time for the payment of a debt, void because it impaired the contract.

Chief Justice SHARKEY, in discussing the power of a Legislature to change the law affecting acquired rights of a banking company, says: "Where any vested right is taken away, or the obligation of any contract is impaired, the act so far is void. It is beyond the power of the Legislature." Again he says: "The fundamental maxims of free government seem to require that the rights of personal liberty and *private property* should be held sacred." He further says: "The people in this country understand very well that there is no power in the Legislature to take from them 'that which they own. * * * It can not admit of question that, where the remedy is entirely taken away, the obligation is impaired," &c. 8 *S. and M.* 56.

In the case of *Fletcher v. Peck*, 6 *Cranch*, 127, the United States Supreme Court, in discussing the power of the State of Georgia to annul a contract made by her Legislature, by a subsequent act, declaring the contract fraudulent and against good policy, says: "It may well be doubted whether the nature of society and of government does not prescribe some limits to legislative power, and if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation?"

The court further says: "The validity of this rescinding act then might well be doubted were Georgia a single sovereign power, but Georgia can not be viewed as a single, unconnected sovereign power, on whose Legislature no other restrictions are imposed than may be found in its own Constitution. She is a part of a large empire. She is a member of the American Union, and that Union has a Constitution, the supremacy of which all acknowledge and which imposes limits to the Legislatures of the several States, which none claim a right to pass. " And the court continues: "Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the Constitution viewed with some apprehension

the violent acts which might grow out of the feelings of the moment, and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed.   The restrictions on the legislative power of the States are obviously founded in this sentiment, and the Constitution of the United States contains what may be deemed a bill of rights for the people of each State."

Herein the distinguished jurist, and the highest court of the nation, declare that the people, in adopting the Constitution of the United States, intended to shield themselves and their property from the strong passions that might control a State, and held that those rights vested by contract were above the power of a State.

If those wise men had well founded fears of the force of passion in a State, might we not well expect to see some of its ebullitions upon the close of a desolating war?   Was there ever a time when feeling was more likely to control, or when men were nearer excusable for crossing the bounds of propriety ?

Constitutional limitations, as will readily be inferred from the language used in all the cases above referred to, are not, as has been argued before the court, confined to acts of State legislatures alone, but are applicable to the acts of the State in Convention.

In the case of *Oliver Lee & Co.'s Bank*, the High Court of Appeals for the State of New York, says : "We have seen that the Supreme Court of the United States has held that a State constitutional provision, acting prejudicially upon a contract, is a law passed by a State impairing its obligation within the intention of the Federal Constitution.   This is upon the ground that the substance of the provision is, that the State shall not interfere in any way with the rights which citizens have acquired by contract."

We refer to the case of *Dodge v. Woolsey*, 18 *How.*, 331, wherein the Supreme Court of the United States says:  " The

departments of the Government are legislative, executive and judicial. They are coördinate in degree to the extent of the powers delegated to each of them. Each, in the exercise of its powers, is independent of the other, but all rightfully done by either is binding upon the others. The Constitution is supreme over all of them, because the people, who ratified it, have made it so. Consequently, any thing which may be done unauthorized by it, is unlawful, but it is so to the extent of its delegated powers over all who made themselves parties to it, States as well as persons, within those concessions of sovereign powers yielded by the people of the States when they accepted the Constitution in their conventions. Nor does its supremacy end there. It is supreme over the people of the United States, aggregately and in their separate sovereignties. * * * The people, in ratification of it, have chosen to add, this Constitution * * * shall be the supreme law of the land, and the judges of every State shall be bound thereby; * * * and to make its supremacy more complete, impressive and practical, * * * all executive and judicial officers * * * shall be bound by an oath to support this Constitution. * * * It is claimed by counsel that a new Constitution of a State supersedes every legislative enactment touching its own internal policy, and bearing upon the interests of persons, which may have been the subject of legislation under a preceding Constitution. * * * That all such legislation must give way when found to contravene the will of the sovereign people subsequently expressed in a new State Constitution. * * * A change of Constitution can not release a State from a contract made under a Constitution which permits it to be made. The inquiry is, is the contract permitted by the existing Constitution? If so, and that can not be denied in this case, the sovereignty which ratified it in 1802 was the same sovereignty which made the Constitution of 1851, neither having more power than the other to impair a contract made by the State Legislature with individuals."

Is this extract not a conclusive answer to the strongest ob-

jection against Denton's recovery. It was claimed by counsel
before that court that a new Constitution supersedes former
laws, and must control the State's internal affairs—her courts,
her persons and property—that it is the sovereign will, and
must be obeyed. But that court said not so. Where contracts
existed under a former State Constitution, they must be ob-
served. Apply the principle to this case. Was Denton's con-
tract in 1860 permitted by the Constitution of 1836? If so,
and that can not be denied, the sovereignty which made the
Constitution of 1836 is equal to the sovereignty that made the
Constitution of 1868, neither having the power to impair a
contract.

Has not every principle in this case been adjudged by the
highest court in the Government? That court, upon the most
mature consideration, have decided, in several cases, that a
State Constitution impairing the obligation of a contract is
inoperative, being in conflict with the United States Constitu-
tion. See *Piqua Branch Bank v. Knoop,* 16 *How.,* 369; *Dodge
v. Woolsey,* 18 *ib.,* 331; *Mechanics' &c. Bank v. Debalt,* 18 *ib.,*
380; *same v. Thomas,* 18 *ib.,* 384; *Jefferson Branch Bank v.
Skelly,* 1 *Black,* 442; *Franklin Branch Bank v. State of Ohio,* 1
*ib.,* 474; *Cummings v. State of Missouri,* 4 *Wallace,* 277.

In these cases, the decision depended upon the power of the
sovereign people of Ohio and Missouri, in convention, to im-
pair existing obligations; and that court uniformly held that
such power did not exist.

In the case of *Cummings v. The State of Missouri,* 4 *Wallace,*
325, that court says: "The theory upon which our institutions
rest, is that all men have certain inalienable rights. * * *
It (the Constitution) intended that the rights of the citizen
should be secure against deprivation for past conduct by
legislative enactment, under any form, however disguised. If
the inhibition can be avoided by the form of the enactment,
its insertion in the fundamental law was a vain and futile pro-
ceeding.

As a further answer to the argument that the State courts

can not assume jurisdiction and give judgment, we may say it is not disputed that the inferior courts had original and this court appellate jurisdiction, in actions of debt upon contracts, where the consideration was for slaves or other property, before the adoption of the Constitution of 1868; in which, referring to courts below, the Supreme Court, section 5, article 7, declares that "the inferior courts of the State, as now constituted by law, except as hereinafter provided, shall remain with the *same jurisdiction as they now possess*," &c. The only exception in the least affecting this case, is in section 14, article 15, above quoted. Now, if this section is inoperative because it is repugnant to the Constitution of the United States, the Constitution of 1868 stands exactly as if that section had never been inserted in it. That being true, under the clauses of general jurisdiction, the courts of the States have all requisite power to hear and determine such suits. And, to the assertion that we can not declare a clause in our State Constitution void, we need only say, the Supreme Court of the United States has decided differently. In the case of Cummings against the State of Missouri, a direct attack was made upon Missouri's Constitution. That court decided that the Supreme Court of the State of Missouri erred because it did not declare a provision in the Constitution of its own State void.

In the several cases last referred to, the United States Supreme Court held that the Supreme Courts of the States committed error because they did not declare their State Constitutions void, in so far as they had passed acts impairing the obligation of contracts. State, like national courts, must first obey the fundamental law of the Government.

Then it is necessarily right, according to the opinion of the Supreme Court of the United States, that, wherein our State Constitution declares a valid contract null and void, we decide it to that extent contrary to the Constitution of the United States, and not binding upon the courts and people of the State.

It therefore follows that, in our opinion, the court below did not err in sustaining the demurrer of the appellee to the appel-

lant's three several pleas. The judgment of that court is affirmed.

McCLURE, J., dissenting, says:

I have been unable to arrive at the conclusions reached by a majority of the court, and shall now proceed to give the reasons which have led to a dissent:

The writings obligatory sued on, as appears from the record, were given for the purchase of negro slaves. In March, 1868, the people of the State of Arkansas adopted the present Constitution, which was submitted to the Congress of the United States, and by that body approved in June of the same year.

In the Constitution alluded to there is a provision prohibiting slavery or involuntary servitude. There is also another clause, containing three separate and independent declarations, two of which may fall without affecting the other. The clause to which I allude declares: First. That all contracts for the sale or purchase of slaves are null and void. Second. That no court of this State shall take cognizance of any suit founded on such contracts. Third. That no amount shall ever be collected or recovered, on any judgment or decree, which shall have been or which hereafter may be rendered, on account of any such contract or obligation, on any pretext, legal or otherwise.

The object of the first declaration was to destroy the *right of property* in all slave contracts. The object of the second declaration was to deprive the State courts of the power to hear and determine any cause wherein the amount sought to be recovered was for the purchase of slaves—no matter whether the contract was entered into without or within the State. The object of the third declaration was to not only destroy the *right of property* in a judgment that had already been obtained upon slave contracts, but to destroy the right of property in such judgments as might be rendered between the adoption of the Constitution by the people and the admission of the State by Congress.

Whether any of these objects were laudable, is a question

that I conceive this court has no power to determine. The second declaration is that: "No court of this State shall take cognizance of any suit founded on such (slave) contracts;" and to the force and effect of this language I shall confine the present discussion; and, in order to determine the authority and power of the State courts, it may not be amiss to inquire from whom and from what source the courts of this State derive the authority to hear and determine causes? If it appears from the examination that the courts exist without any action on the part of and independent of the people who constitute the sovereignty of the State, then it will be admitted that the constitutional provision under consideration is an unwarranted act of usurpation on the part of the people toward a sovereign judiciary. But, on the other hand, if we should find that the authority under which we act is delegated, and not a sovereign authority, then I conceive that the Constitution should be the rule and guide of our action.

In *Rhode Island v. Massachusetts* (12 *Peters*, 657) it was held that "the Supreme Court of the United States exists by virtue of a direct grant of power from the people," and that "it exercises its authority as their agent for the purposes specified." This, I conceive, to be the true status of the judiciary of every State of the Union—that is, that the courts, like the Legislature, exist by virtue of a direct grant of power by the people. When we are called upon to pass on the question as to whether the executive or legislative branches of the Government had authority to perform an act questioned, we at once turn to the Constitution for the purpose of ascertaining whether they have gone beyond the scope of their authority; if, then, we would turn to the Constitution to ascertain the measure of *their* authority, why not turn to it to ascertain the measure of *our own authority?*

Justice WASHINGTON, in *Ogden v. Saunders*, (12 *Wheat.*, 280,) says: "Every judiciary in the Union owes its existence to some legislative act." The Supreme Court of the United States, in *Prigg v. Pennsylvania*, (16 *Peters*, 614,) said that:

" Every State is perfectly competent, and has the *exclusive* right, to prescribe remedies in its own judicial tribunals ; to limit the time, as well as the mode of redress, and to *deny* their *jurisdiction* over cases which its *own policy* or its own Constitution either *prohibit* or *discountenance*." Now, the same power that provided this court should consist of five judges, has declared that no court of this State shall take cognizance of any suit founded on a note given for slaves; and if the Constitution is the supreme law of the land, upon *all* subjects upon which it speaks, from what clause do we derive authority to say that one clause is binding and that another is not ?

The majority of the court, in reply to this question, point me to the second subdivision of article six of the Constitution of the United States, which declares : " This Constitution, and the laws of the United States which shall be made in pursuance thereof,   *   *   *   shall be the supreme law of the land, and the judges in every State shall be bound thereby, any thing in the Constitution or laws of any State to the contrary notwithstanding."

In reply to this, I say this is not the Constitution which authorizes us to adjudicate upon the rights of parties; in reply, I state that this Constitution is not our *commission* to act as judges in the State of Arkansas, and that no member of this court .derives any authority or power of a judicial character from the Constitution of the United States. In the language of the Supreme Court of New Hampshire, I say that " Congress is nowhere authorized to employ, nor are the States any where prohibited from denying, the use of their judicial tribunals, to carry into execution the laws of Congress;" and that the right of regulating the State tribunal is one of the powers not delegated to the .United States by the Constitution, but reserved to the States or people respectively, under the tenth article of the amendments to that instrument.

I am admonished that we have each taken an oath to support the Constitution of the United States, and to acknowledge that instrument as the supreme law of the land. Admit-

ting and conceding all this, I am still unable to see wherein that clause confers any *jurisdiction* upon the State courts. A justice of the peace is a judicial officer, and takes the same oath that the members of this court do, but nobody ever dreamed that he derived any power or authority *to hear and determine cases*, or that his *jurisdiction* was enlarged or restricted by any other authority or power than the Constitution and laws of the State, whose officer he is. I concede that in protecting the rights of parties, or in the enforcement of a contract, the subject matter of which would be *cognizable* before a justice of the peace, that the rights of the parties would have to be measured by the Constitution of the United States, and the laws made in pursuance thereof; but, in a class of cases where by the law of the State they had NO JURISDICTION to enter a judgment at all, I emphatically deny that article VI. of the Constitution of the United States, no matter what his oath may have been, or how often taken, would authorize him to take jurisdiction of a class of contracts expressly withheld from judicial cognizance by either the laws or Constitution of the State. And this is the principle applicable to this court. If the clause denying the courts jurisdiction in this class of contracts had not been inserted in the Constitution of the State, then the question before this court would have been whether the people, in their sovereign capacity, could destroy the right of property in notes and judgments, the consideration of which was the sale or purchase of slaves; but such is not the question now presented. The question is: Will this court assume jurisdiction of a class of cases the people have declared they shall not? I have examined the writings and opinions of learned and eminent jurists, as to the construction to be placed on the section now under consideration, and, isolated and alone, this case stands as the only authority that points to article VI. of the Constitution of the United States as the fountain from which the State courts derive the power *to hear and determine cases.*

What is a court? Bouvier says it is "a body in the govern-

ment to which the public administration of justice is *delegated.*" Now, mark well what he says: "A body in the government to which the public administration of justice is DELEGATED." Is not this court a creature of the Constitution? Does it not owe its existence to the Constitution? Is not its jurisdiction limited by the Constitution? Are not its members chosen in the manner pointed out by the Constitution? If these questions be answered in the affirmative, it strikes me, that an assumption of power or authority in violation of its provisions, ought to be corrected by a court of impeachment.

What is a constitution? It is a form of government delineated by the mighty hand of the people; it is that by which the powers of government are limited; it is to the departments of government what *law* is to individuals; it is not only a rule of action to the different branches of government, but it is that from which *their existence flows.* If, then, there be any form of words which should be held sacred, it is the plain language of the fundamental law. No matter how cogent the reasoning may be—no matter how great the wrong complained of—the courts should be governed by the principles of law, and not by the hardship of any particular case. The courts are creatures of organized society; they are created to perform the duties assigned them by the sovereign power. It is peculiarly the province of the Legislature to provide the remedies for the redress of wrongs and the enforcement of civil and natural rights. It is the duty of the courts to apply these remedies—but the Constitution nowhere authorizes this court to provide remedies or administer justice in cases where the people have prohibited the different branches of government from enforcing contracts which are against the declared policy of the State. If written constitutions can be invaded by one branch of the government, the experiment of setting a boundary to power will have proved a failure. In *Purdy v. The People*, 4 *Hill*, 384, the court said that "in construing the language of the Constitution, the courts have nothing to do with the argument from inconvenience—their sole duty is to declare *ita lex scripta est*—thus saith the Constitution."

Blackstone, or perhaps it may have been Stephens, says that " law is a rule of civil conduct, prescribed by the Supreme *power* of the State." This may be a good definition of the word *law* in England, but it does not strike me as being perfectly accurate when applied to this country. In the United States, not only the General Government, but the different State Governments all have written constitutions which place restrictions on the law-making power; therefore, strictly speaking, law is the will of the Legislature, in its derivative and subordinate capacity. The *Constitution* is the law governing and operating upon the judicial, executive and legislative branches of the Government; while the will of the *Legislature* is the law that operates upon the great mass of the people. I have briefly referred to this distinction between the Constitution and a law to the end that it may not be forgotten that the people do not *derive their rights from the Constitution*, but that it is the PEOPLE from whom this court derives all authority to act. The English subject derives his rights from a kind of mythological document, known as the British Constitution, but the American citizen draws his rights from no such source. Instead of writing on parchment what rights HE is entitled to, he shortens the task and limits the power of government.

It is urged that the clause of the Constitution (*sec.* 14, *art.* 15) now under consideration, denying jurisdiction to the courts of the State, in cases where the consideration was slaves, impairs the obligation, because the citizen is left without a remedy or tribunal to enforce his contract. It will be borne in mind that this court not only draws its *sustenance* from the Constitution, but that it is a *creature* of that instrument. It will also be borne in mind that the judicial powers created by the Constitution of the United States can only be vested in the courts created by that Constitution, and the acts of Congress, and that the State courts derive no authority or power from either of these sources. This court, in a case in which it has jurisdiction, has the power to declare a law passed by the *Legislature* in conflict with the Constitution of the State, or

the United States; but it does not follow from this, that it is the forum in which to determine what a sovereign people may do, even though private rights may have been invaded.

The point of divergence between the majority of the court and myself is, that they insist that the *remedy*, or rather the law affording a remedy, at the time the contract was made, enters *into* and becomes a part of the contract, while I contend that the law does not enter *into* the contract, but operates *upon* it in just such a manner as the sovereign or law-making power may deem expedient. In other words, that the *enforcement* of contracts is a matter wholly within the control of the sovereignty of the State, and over which there exists no supervisory power, so long as there is no attempt to *discharge the debtor without payment.* In support of their position, they quote from the opinion of Justice BALDWIN, in *McCracken v. Hayward*, which says: "The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence *when it was made;* these are necessarily referred to in all contracts, and form a part of them," &c. Again, they quote from the case of *Blain v. Williams*, 4 *Littell*, 38, wherein the court said: "The legal obligation of a contract evidently consists in the *remedy* to enforce it." Again, they quote from the case of the *Commercial Bank of Natchez v. Chambers*, 8 *Smeed and Marsh.*, 56, wherein Judge SHARKEY says: "It can not admit of a doubt that where the *remedy is entirely taken away*, the obligation is impaired."

In response to these authorities, and the arguments made in support of them, I shall content myself by referring to and quoting from the opinions of the learned judges who presided at the hearing, in the Supreme Court of the United States, in the case of *Ogden v. Saunders*, 12 *Wheat.*, 282. Justice JOHNSON, in that case, said: "The Constitution was framed for society, and an advanced state of society, in which I will undertake to say that *all* the contracts of men receive a relative and not a positive interpretation; for the rights of all must be held and enjoyed in subserviency to the good of the whole. The

*State construes them,* the STATE *applies them,* and the STATE decides how far the social exercise of the rights they give us over each other *can be justly asserted.*" He further states, that " when men enter into an organized state of society, the *remedy* for the enforcement of their contracts is no longer retained in their own hands, but surrendered to the community—to a power competent to do justice, and bound to discharge toward them the acknowledged duties of government to society according to the received principles of equal justice." Again he says : "I must not be understood as reasoning upon the assumption that the *remedy* is grafted *into* the contract; for, if the *remedy enters into the contract,* then the States lose all power to alter their laws for the administration of justice." Again he says: "The Constitution pledges the States to every creditor for the full and fair exercise of State power to the ends of justice. It is very true, that inconveniences may occasionally grow out of irregularities in the administration of justice by the States. But the citizen of the same State is referred to his *influence* over his own institutions *for his security;* and the citizens of the other States have the institutions and powers of the General Government to resort to. And this is *all* the security the Constitution ever intended to hold out against the undue exercise of the power of the States over their contracts and *their own jurisprudence.*" Again he says: " But it is not only in their execution laws that the creditor has been left to the *justice and honor of the States* for his security;" and he continues by saying: "Every judiciary in the Union owes its existence to some legislative act ; what is to prevent a repeal of that act? What is to prevent the extension of the right to imparl, of the time to plead, of the interval between the sittings of the State courts ? Where is the remedy against all this? Why were not these powers taken also from the States, *if they could not be trusted* with the subordinate and incidental power here denied them ? The truth is, the Convention saw all this; and saw the *impossibility* of providing an adequate remedy for such mischiefs, if it was not

to be found *in the wisdom and virtue of State rulers.*" Continuing in this course of reasoning, he concludes by saying that : "The right of the creditor to the aid of the public arm for the recovery of contracts, *is not absolute* and *unlimited*, but may be modified by the necessity or *policy* of society."

Justice TRIMBLE in the same case, says:   "Men have by the laws of nature the right of acquiring and possessing property, and the right of contracting engagements; that, in a state of nature, when men have not submitted themselves to the controlling authority of civil government, the natural obligation of contracts is coëxtensive with the duty of performance.   But when men form a social compact, and organize a civil government, they *necessarily surrender* the regulation and control of these natural rights and obligations *into the hands of the government.*"   Again he says : "It has often been said that the laws of a State, in which a contract is made, enter *into* and make a part of the contract;" and, in reply to this proposition, he says: "*The argument is destitute of truth.*"   Again he says : "The contract is nothing but the agreement of the parties; and that if the parties, in making their agreement, use the same words with the same object in view, *where there is no law,* or where the law recognizes the agreement, and furnishes remedies for its enforcement, or where the law forbids, or *withholds all remedy* for the enforcement of the agreement, it is the *same contract* in all these predicaments."   Again he continues, by saying: "Admit that men derive the right of private property and of contracting engagements from the principles of natural or universal law ; admit that these rights are not derived from or created by society, but are brought into it ;   *   *   *   yet it is equally true that these rights and obligations, resulting from them, are subject to be *regulated, modified* and sometimes *absolutely restrained* by the positive enactions of *municipal* law.   If the *positive law* of the State declares the contract shall have *no obligation,* it can have no obligation.   This doctrine has been held and maintained by all States and nations ; and the power of controlling, modifying and *even of taking*

*away all obligation* from such contracts, has been exercised by all independent sovereigns."

Chief Justice MARSHALL, in the same case, speaking for himself and Justices STORY and DUVALL, says: "It is insisted that the law enters *into* the contract so completely as to become a constituent part of it. This is unquestionably *pressing* the argument very far; and the establishment of the principle leads inevitably to consequences which would affect society deeply and seriously. We (speaking for himself and Justices STORY and DUVALL) have no hesitation in saying that however a law may act *upon* contracts, it does not enter *into* them and become a part of the agreement." Again he says: "The counsel insist that the right to regulate the *remedy* and to modify the obligation are the same; that *obligation* and *remedy* are identical; that they are synonymous—two words conveying the same idea; that they are precisely commensurate with each other, and are such sympathetic essences that the action of law upon the remedy is immediately felt by the obligation; that they live, languish and die together." In reply to this, he says: "The *obligation* and *remedy* originate at different times; that the obligation to perform is coeval with the undertaking to perform; it originates with the contract itself, and operates anterior to the time of performance; the *remedy* acts *upon* a broken contract and enforces a *preëxisting* obligation; that, when men come into society, they can no longer exercise the original and natural right of coercion; its retention would be incompatible with the general peace, and is therefore surrendered. Society prohibits the use of private individual coercion, and gives in its place a more safe and more certain remedy. But the right to contract is not surrendered with the right to coerce performance. *Obligation* and *remedy*, then, are not identical; they originate at different times, and are derived from different sources." Again he says: "We are told that the power of the State over the remedy may be used to the destruction of all beneficial results from the right;" and in answer to the proposition, he says: "The local governments

42

are restrained from impairing the obligation of contracts, but they furnish the remedy to enforce them, and administer that remedy in tribunals constituted by themselves.  To afford remedy is certainly the high duty of those who govern to those who are governed.  A failure in the performance of this duty subjects the government to the just reproach of the world, but the  Constitution (of the United States) *has not* undertaken to *enforce its performance;* its language is the language of restraint, *not that of coercion;* it prohibits the States from passing any law impairing the obligation of contracts ; *it does not enjoin the States to enforce contracts.*  Should a State be sufficiently insane to shut up or abolish its courts, and thereby withhold *all remedy*, would this *annihilation of remedy* annihilate the obligation of contracts also ?  WE KNOW IT WOULD NOT.  If the debtor should come within the jurisdiction of any court of another State the remedy would be immediately applied, and the inherent obligation of the contract enforced.  If that *high sense of duty*, which men selected for the government of their fellow-citizens must be supposed to feel, furnishes no security against a course of legislation which must end in self-destruction ; if the solemn oath taken by every member, to support the Constitution of the United States, furnishes no security against intentional attempts to violate its spirit while evading its letter."  At this point the train of argument is lost, as will be seen by an examination of the case; (12 *Wheat.*, 353;) but enough is presented to convince the mind that the citizens of the States are dependent upon the "sense of honor" of the men whom they have themselves chosen to protect and correct all denial of right or remedy. and failing in this, they must abide the consequences.  In the remarks last quoted, it is evident that the Chief Justice was speaking of the power of the *Legislature* over the *remedy;* but, in the case now under consideration, the question is not one of *remedy*, but of the *jurisdiction of the courts;* which, as I will show, is a very different question.  The Supreme Court of the State of Kentucky, have always held, as I have stated, that

"the legal obligation of a contract consists in the remedy given by law to enforce its performance;" yet, *in the same case* in which this holding is made, it was further held that "an act of the Legislature which *forbade the rendition* in all courts of the State of *any judgments* for debt from date until January 1, 1862, *did not* impair the obligation of contracts; that the act did not relate to the *remedy*, but to the *courts* which administer the remedy, and that, in a legal sense, *the* COURTS *constituted* NO *part of the obligation of a contract.*" The inference to be drawn from this opinion (*Johnson v. Higgins*, 3 *Metcalf, Ky.*, 566) is that, if the Legislature had attempted to have stayed the judgment, it would have impaired the obligation; but that a mere regulation of the *jurisdiction* was a matter within the control of the Legislature. In the States of Pennsylvania, Ohio and Illinois, during the late war, laws were passed continuing all actions for the recovery of debts against persons in the Federal army, until their return. In all of those States it was claimed that the law impaired the obligation of a contract; but the Supreme Courts of those States held, in effect, that the courts were deprived of the power to render judgments until the return of the person of the debtor, and that this exercise of legislative power over the jurisdiction of the courts did not impair the obligation of contracts. In the case now before us, we are not withheld by a *legislative* act, but by the solemn agreement of men entering into an organized body of society, wherein was defined the powers withheld from the judiciary. When the people adopted this Constitution it was not their intention to create a court with jurisdiction over slave contracts; but it seems that we, who were elected as their servants for one purpose, have now become their servants for another.

Up to this point I have cited the elaborate opinions of Chief Justice MARSHALL and Justices STORY, DUVALL, TRIMBLE and JOHNSON, upon the points of difference between the majority of the court and myself, while they have produced the opinions of Justice BALDWIN, Judge BOYLE, of Kentucky, and

Judge SHARKEY, of Mississippi. And, without attempting to detract from the ability of the latter, I am compelled to say that the reasoning of the former have aided me in coming to my present conclusions.

In quoting from these opinions I have had two objects in view: First. To show that a denial of a *remedy*, or a *tribunal*, to a citizen of the State, in no manner impairs or discharges the obligation of a contract, and that the only remedy the citizen has, where a tribunal or remedy is withheld, is by an appeal to the intelligence of the people or sovereignty that withholds the remedy, or, closes its tribunals. The second object was to show that the neglect or refusal to provide a tribunal in this instance was a neglect of a political character, and one that can not be corrected or remedied under any authority—legislative, executive, or judicial—derived *from the Constitution of the United States.*

The five judges who delivered opinions in the case of *Ogden v. Saunders,* all agree that the citizen surrenders all right to individually enforce the obligation of the contract to the organized body of society of which he becomes a member. They all agree that the *remedy* and *tribunal* in which the contract may be enforced, is left wholly under the control of the State authorities; they all speak in uncomplimentary terms of a State that would close its tribunals to prevent the enforcement of a contract; but, at the same time, they all admit that no judicial tribunal, sitting under or by virtue of a State or national Constitution, can remedy a wrong committed by a sovereign power.

The majority of the court lay much stress upon the fact that this clause of our State Constitution, and such action as I have alluded to, destroys private property—a thing in violation of the Constitution of the United States. I do not propose to be drawn into the discussion of a question that I deem foreign to this case. But if the people of a State, or the United States, had the right to destroy all right of property *in slaves* without compensation, over that clause of the Constitution of the

United States which declares: " No person shall be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use without just compensation," it will be very difficult for the advocates of the thirteenth amendment to answer why the same power, in the same manner, is without authority to destroy all right of property in *notes* founded upon the *sale or purchase of slaves?* I know it has been claimed that the Constitution of the United States was of a kind of magic circle thrown around the institution of slavery and its incidents; that an invasion of this circle would be visited with all the dire effects that would have followed the anathemas of the Church of Rome, but I am not advised that property in a slave *note* is any more sacred or entitled to a higher or holier protection than the property in *slaves*.

I have asserted that, in my opinion, the State courts derived no authority or power to hear and determine cases from any clause of the Constitution of the United States; that they moved, breathed, and derived their existence and sole support from the Constitution of the State. No axiom is more clearly established in law or reason than that, wherever an end is required, the means are authorized; that wherever a general power to do a thing is given, every particular power necessary for doing it is included.

Section 5 of article VII. of the Constitution of this State, declares that "the General Assembly may provide for the establishment of such inferior courts, *changes of jurisdiction*, or *abolition* of existing inferior courts as may be deemed requisite." It will be observed, from the language of our Constitution, that the *jurisdiction* of the inferior courts is left wholly to the discretion of the Legislature. Not only the jurisdiction of the courts is left to the discretion of the Legislature, but the *abolition* of existing inferior courts is left to their discretion. In every State in the Union the Legislature has regulated by law the *time* and place of holding the State courts. The circuit courts of this State are held under the provisions of an act entitled "An act to divide the State into ten judicial circuits

and fix the time of holding circuit courts." Suppose the Legislature, at its next session, should repeal this act, and neglect to pass any other act fixing the time of holding circuit courts. I will now suppose that the courts remain thus closed until the statute of limitation has become a bar, not only against these slave contracts, but all other writings obligatory for the payment of money. Will it be contended that there is any power in Congress to open the courts thus closed? Will it be contended that Congress can regulate the jurisdiction and sittings of the State courts? If Congress can not do these things, will it be pretended that the Supreme Court of the United States can? The majority of the court would answer the question by saying that the repeal of the act fixing the time of holding the courts impaired the obligation of a contract, by depriving the creditor of all remedy; and, being in conflict with the Constitution of the United States, that the circuit judges would be justified in disregarding the repeal of the law, and fully authorized to hold their courts as before the repeal.

We will now suppose that a court of impeachment was convened, and a circuit judge arraigned for attempting to hold a court under the provisions of a law that had been repealed. Admit that, on the trial before that court, he had produced the opinion of the Supreme Court of the United States, wherein it had declared that the action of the Legislature, in repealing the law regulating the holdings of the circuit courts, impaired the obligation of contracts, and was null and void, by reason of being in conflict with the Constitution of the United States ; but now let us suppose that the court of impeachment should think differently, and refuse to recognize the judgment of the Supreme Court as a good plea in bar, and remove the judge from office, where is the power to reverse this judgment, or reinstate this officer? There is none ; and the fact that there is not, presents the proof that the State authorities have absolute control over the officers and courts of their own creation ; *for, in every case where a power is exercised under the provisions of the Constitution or laws of the United States, its courts and officers are*

*fully authorized and empowered to protect persons acting thereunder, from prosecution instituted by State authority, for the performance of a duty or act authorized by the Constitution or laws of the United States.*

Justice JOHNSON says: "It is the ruling principle of the Constitution of the United States to interfere as little as possible between the *citizen* and *his own government*, and it is for this reason that the executive, legislative and judicial functions of the State are left as they were before the adoption of the Constitution by the people of the States." An examination of the Constitution of the United States will disclose the fact that there are very few cases in which the courts created thereby, or thereunder, have jurisdiction between citizens of the same State. This fact alone presents itself to my mind as an intention on the part of the people, who created the General Government, to retain to the States, and the people, the right of controlling their own tribunals in accordance with the declared policy of the State; and any other solution of this question would have placed the public policy of the State under the absolute control of Congress. I have stated that, in my opinion, there was no power conferred upon any one of the branches of the General Government to regulate the sittings or jurisdiction of the State courts. In support of that view, I submit that if Congress or the Supreme Court are endowed with this power, it would be impossible for any action of the State to violate the obligation of a contract, because, if either branch of the General Government has this power or authority, a neglect to exercise it is no proof that the State has impaired the obligation. It will be conceded that, where power or authority is granted in general terms, the compulsory power necessary to carry the grant into execution is an absolute incident. Have either Congress or the Supreme Court the *compulsory* power to compel a State judge to hold a court in a State, under the provisions of an act repealed by the Legislature, or to hear and determine a case prohibited by the Constitution of the State? If it be conceded that neither of these branches of

government have this compulsory power, then I submit that the concession admits the correctness of my views, and presents an unanswerable argument in support of the position that the State is supreme in all things pertaining to the sittings and jurisdiction of her own courts.

The majority of the court, with profound satisfaction, quote from the opinion of the Supreme Court of the United States in the case of *Dodge v. Woolsey*, 18 *How.*, 331, where it is said that " a change of Constitution can not release *a State* from a contract made under a constitution which permits it to be made, because the same sovereignty that ratified the Constitution of 1802 was the same sovereignty that made the Constitution of 1851, neither having the power to impair the obligation of a contract made *by a State Legislature* with *individuals.*" This case is cited as high authority to show that private contracts made by individuals *between themselves*, under the Constitution of 1836, can not be destroyed under the provisions of the Constitution of 1868. I submit that the decision establishes no such thing. It merely says that the *same sovereignty* can not change a contract made with an *individual*. An examination of the case will show that under the Constitution of Ohio, of 1802, the Legislature incorporated what was known as the " State Bank of Ohio." In the act of incorporation which constituted the charter of the bank, as the Legislature had power to do, the rate of taxation to be collected from the bank was fixed at a rate per cent. on the dividends. In 1851, the people of Ohio adopted a new Constitution, wherein a different rule of taxation was fixed upon all capital employed in banking. The banks claimed protection, because the State had stipulated to take a rate per cent. upon the dividends. It was insisted, on the other hand, that the people, in the exercise of the aggregate sovereignty of the State, had established a different rule, and the Supreme Court of the United States, in effect, said : " By the Constitution of 1802, you clothed your Legislature with full power and authority to make this agreement with the bank ; the men who did this thing were of your own selection, and you will not now be

allowed to ignore a contract which you gave your agents full power to enter into." The contract in this case, however, is not made by the *State* on the one side and an *individual* or individuals on the other. It was an agreement entered into between *individuals* under the provisions of a Constitution that *was destroyed* by force and violence; and, when this body of unorganized society was called upon by Congress to form an organic law for their government, they solemnly declared slave contracts to be null and void, and prohibited the courts created by the Constitution from exercising jurisdiction over them, as I am of opinion they had a perfect right to do. It will be borne in mind that the political branch of the Government of the United States, whose duty it is to guarantee to every State in the Union a republican form of government, *had declared* that no legal government existed in the State of Arkansas. This being true, I submit, that the people who constituted the sovereignty that adopted the Constitution of 1836, were nothing more or less than a disorganized state of society; and, being so, had a perfect right to prescribe the terms and conditions upon which they would enter a government republican in form, subject however, to the approval of Congress.

Look but for a moment to the condition of the people at the time Congress asked them to leave a disorganized state of society, and you behold that one-half of the taxable property of the State had been destroyed in the suppression of the rebellion; you behold a large proportion of the citizens of the State deprived of their former means of wealth by the emancipation of their slaves; you behold these same citizens indebted largely for the purchase of slaves that had been liberated long before their labor had approximated to any thing like the consideration to be paid therefor. Under all the circumstances equity, justice and honor would seem to say, a people thus situate, without any legal government, and who had, as yet, received little or no consideration for the notes they had given for slaves, on their return to organized society ought to be allowed to settle upon

a basis that would be just to all under the circumstances then existing.

But waiving the question, for the present, as to whether the people who adopted the Constitution of 1868 are the same sovereignty as those who adopted the Constitution of 1836, I will proceed to inquire if a State may not destroy the right of property in a contract without impairing its obligation. The majority of the court say that it can not be done; that a State is prohibited by the national Constitution from taking private property without making just compensation. The reverse of this proposition has so often been decided by the Supreme Court of the United States that I am compelled to express some astonishment at the assertion. In 7 *Peters*, 247; 5 *How.*, 411; 6 *How.*, 507; and 20 *How.*, 84, the question as to whether any restraint was placed on the States in relation to taking private property, with or without compensation, was fully presented to the court, and the uniform holding has been that the words " nor should private property be taken for public use without just compensation," was " intended to prevent the Government of the *United States* from taking private property, and *was not intended* as a restraint upon the *State* Government." Proceeding from this point on the theory that so long as the action of the States do not impair the obligation of contracts they are independent of the national Government, the question then arises, can a State destroy the *right of property* in a contract, without impairing its obligation? The majority of the court say it can not; and, in so doing, they take issue with the decisions of the Supreme Court of the United States. In *The West River Bridge Company v. Dix, et al.*, 6 *How.*, 507, it appears that the Legislature of Vermont chartered to that company the exclusive privilege of erecting and continuing a toll bridge over West river for a period of forty years. That this charter was as much *property* and *contract* as the note of Jacoway to Denton, I presume will not be denied; yet the Legislature of Vermont rendered that charter valueless, and appropriated the property of the company, and the Supreme

Court of the United States held that, in so doing, the obligation of the contract had not been impaired. In the case just cited, the toll bridge of the company was taken for public use, and it was alleged, before the Supreme Court of the United States, that the Constitution of the State declared that a just compensation should be made for all private property seized and dedicated to public use, and that such compensation had not been made. In reply to this proposition the court said they had no power to correct evils of that nature; that it was a matter wholly within the control of the State authorities.

Under every established government the *tenure of property* is derived mediately or immediately from the sovereign power of the political body; it can rest on no other foundation, and can have no other guarantee. Every contract is made in *subordination* to the higher authority of the law of nature, or nations, or *of the community to which the parties belong*, and must yield to their control; such a condition, is the right of eminent domain. The exercise of this right of eminent domain does not operate to impair the contract; it is only the resumption of an investure that the parties to the contract knew belonged to the sovereignty of which they were members. The tenure of property in the slave was derived from the same authority that recognized the tenure of property in the note of Jacoway to Denton. In the light of *property* they drew life from the same fountain. Justice DANIELS says the language and meaning of the constitutional inhibition, that States shall not pass laws impairing the obligation of contracts, was " designed to embrace proceedings attempting the *interpolation* of some *new term* or *condition*, foreign to the original agreement." The declaring these slave contracts " null and void," is not the " interpolation of any *new* term or condition;" it is the resumption of an investure, and the exercise of a power that the people, as a sovereignty, deemed commensurate with the public necessity. It may be said that " public necessity" did not require this; and, in reply, I say that this tribunal is not the judge of that fact. The power that sits

behind us, the sovereignty of which we are servants, have decided the question of "public policy;" and, in my opinion, there is no tribunal authorized to sit in judgment, or review their action. .

I am aware that the stay and insolvent laws (of a retrospective character) of many of the States have been held to impair the obligation of contracts; but these rulings have al[1] been placed on the ground that "a new condition had been interpolated" into the terms of the contract. In these cases, the sovereignty of the State had not declared the contract a *nullity;* but, on the contrary, the validity of the contract was recognized, and the legislative action directed toward discharging the debtor without full payment, or to extending the time for payment. In this case the contract *itself* is declared to be " null and void," and its enforcement against the public policy of the State. When the people of Arkansas were forming a *government* for themselves, they had a perfect right to provide that the Legislature should neither pass laws or organize courts to enforce the collection of debts due by one citizen to another, and there is no power in the national Government to compel them to. In the formation of the government, so far as related to *themselves*, they had an unquestioned right to declare that a note, the consideration of which was a slave, should not be considered an element of propery, *within the sovereignty.* A denial of this right to the people of Arkansas is an admission that the power is in Congress, or the Supreme Court of the United States, to declare of what things property shall consist in the different States of the Union—a power that neither branch of the national Government ever claimed or attempted to exercise. A declaration that these contracts are " null and void " of course can not affect the validity of slave contracts held by the citizens of other States against the citizens of this State, nor has any attempt been made in that direction. It is true that we have closed our courts against the citizens of other States, in relation to the enforcement of slave contracts ; but, in doing so, no obligation of

their contracts have been impaired. The Federal courts are open to them, and the inhibition placed on our courts, and the declaration of nullity has no application either to their contracts or the manner of enforcing them. The slave contract, held by the citizen of another State, is property within that State, and I concede that no action of the people of Arkansas could destroy the tenure of property therein; but, at the same time, contend that, as to the citizens of Arkansas, there is neither force or virtue in these slave contracts. They have consented that all such contracts are " null and void."

The majority of the court say, to the assertion " that we can not declare a clause in our State Constitution void, we need only say the Supreme Court of the United States has decided differently." And, in support of this statement, they declare that " the Supreme Court of the United States decided that the Supreme Court of Missouri erred because it did not declare a provision of its own Constitution void." An examination of the opinion, in the case referred to, (*Cummings v. The State of Missouri*, 4 *Wall.*, 332,) will show that the principle announced must have been drawn from some other source than that cited, for there is no such doctrine laid down in that case. The court, in the case referred to, held that the second article of the Constitution of the State of Missouri, depriving priests and clergymen of the right to preach or teach, is in violation of the provision of the Federal Constitution prohibiting States from passing an *ex post facto* law. In the case now before the court, Denton's right of property in the note was not attempted to be destroyed because of any participation in the rebellion, or for any crime, as was the case in *Cummings v. The State of Missouri*. In that case the Constitution and laws of Missouri required priests and clergymen to take a certain oath, within sixty days, and if they did not, and still persisted in preaching, the individual so offending was to be imprisoned ; and, under this state of affairs, Cummings was imprisoned, and from this imprisonment he was discharged by the Supreme Court of the United States. In the case now before the court, the parties

were forming a government from a disorganized state of society, in which, by an upheaving of the rebellion, more than one-half of the wealth of the State had been destroyed, and in this reorganization, and under such circumstances, will it be contended that the people could not commence the new structure on the hard pan of equal and exact justice? This question, as to the power of the *people* to say, upon entering an organized body of society, of what property shall consist, and what subjects may be brought before the tribunals of their own creation, has never been settled by any court. The power of a *State Legislature* has received judicial construction, and its powers have been adjudged to have a limit; not so, however, with the power of the people as to questions of policy that only affect the *citizens* of the *same sovereignty*. In conclusion, I will state that this is the *first and only instance*, wherein the highest court of a State has held a provision of the Constitution of a State void, *in order to extend its jurisdiction*. In my opinion, a decent respect to the opinions and feelings of the people of the State, demanded that, if their Constitution was to be declared null and void by any tribunal, it was due to them that the task be left to other hands than ours. For the reasons here presented, I am of opinion that this court has no jurisdiction in this case.

Judge BOWEN dissented from the conclusions of the majority of the court, upon the ground that it was against public policy to enforce contracts for the sale of slaves.

The manuscript opinion having been mislaid, accounts for its non-appearance here.                    REPORTER.