PILLOW *v*. BROWN & CHILDRESS, *Ex. etc.*

SLAVE CONTRACTS—Held: The clause in the State Constitution that "all contracts for the sale or purchase of slaves are null and void and no court in this State shall take cognizance of any suit founded on such contracts," etc., is in violation of the Federal Constitution.

INTEREST—*Suspension of.*—When a debtor, without fault on his part, is prevented from paying the debt at and after maturity, through the act of the creditor or the law, interest should be abated during the time he is so prevented—and this, the debtor should show by affirmative proof.

CONTEMPORANEOUS STIPULATIONS—*Construction of.*—Where a transaction is evidenced by two papers, the connection between which is established by their contents, without any necessity of referring to other matter to connect them together, they will be taken as one entire agreement.

LAW OF NATIONS.—During war, all intercouse is prohibited between enemies.

PENALTIES REMITTED.—Where a person agrees to do an act, which is neither *malum in se* nor *malum prohibitum*, at the time of entering into the agreement, and is prevented from doing the act, by the law, it excuses him from all penalties that would otherwise arise from his omission.

TRUSTS—*When presumed.*—Trusts are never presumed, unless clearly intended by the parties, except in cases, where a failure so to declare, would operate as a fraud upon one of the parties.

*Appeal from Phillips Circuit Court.*

HON. JAMES M. HANKS, Circuit Judge.

*Pillow, Garland & Nash*, for appellant.

The main question involved, and raised for the decision of this court is, as to the validity of the notes and the powers of the courts to adjudicate the question—and it is submitted on behalf of the appellant, that slavery, as it is known to have existed in this and other States, was not recognized by the Constitution of the United States, and was not compatible with the spirit and purpose of that instrument. The 6th article of the Federal Constitution renders all State Constitutions and laws, in conflict with it *null* and *void*—and article 5, of the amendments declare: "No person shall be deprived of

life, *liberty* or property, without due process of law." From this it is evident that the negro was a "person," and so designated by the Constitution. As to the meaning of the words "without due process of law," See *Bouv. Law. Dec. vol. 1, p 512; Story's Cons. Law, vol. 3, p. 264, 661; 18 Howard (U. S.) 272.* If *legally free*, all bonds, notes, etc., given to enslave him were void, under the United States Constitution.

Pointer's breach of covenant being occasioned by the law, he was released therefrom, and, in consequence, Pillow was released from his obligations to pay.

The non-performance of a contract will always be excused where it is occasioned by the act of the law. *Chitty on Contracts, pp. 742, 743, and note; Lord Angilcia v. Church Warden of Rugeby, 6 Q. B., pp. 104, 107; Chancy v. Overman, 1 Deven & Botts, p. 402; American Jurist, October, 1833, art. 3, p. 251.*

So, also, if a man contract to do an act, in consideration that another contracted to do certain things on his part, which is then lawful, but afterwards becomes unlawful, or if it should turn out that the latter is unable to do what he engaged, the contract is at an end. *Chitty on Contracts, p. (top) 475; Charter v. Lease, 4th vol., pp. 298 and 231.*

If title to goods sold totally fails, contracts would not be binding and may be rescinded, even though the possession of the vendee be wholly undisturbed. *First vol. Story on Contracts, page (top) 484; Second vol. Kent's Com., sec. 39, pp. 472 and 469, note and authority;* see, also, *Wainright v. Bridges, 19 vol. La. R's. 317.*

A vendor is bound to know that he possesses that which he proposes to sell; and even though the subject of the contract be known to both parties to be subject to a contingency, which may destroy it immediately, yet if the contingency has already happened, *the contract will be void. 2d vol. U. S. Digest, p. 288; Allen & Hammon, 11 Peters, p. 63.*

Lord Chief Justice ABBOT, in his work on Shipping (p. 596), lays down this principle: "If an agreement be made to do an act,

lawful at the time of such agreement, but afterwards, and before the performance of the act, the performance be rendered unlawful by the government of the country, the agreement is *absolutely dissolved."* See, also, *Abbot on Shipping, p. 597; 1 Jur. N. S., p. 758; 8 M. & Lee, p. 267; 3 C. L. R., p. 930; 3 B. & P., p. 296; Evans v. Hutton, 4 Man. & Gran.* These are all English cases. See *12 Mass., page 370; 15 Johns., p, 14; 16 Johns., p. 348; 2 Wash. C. C., p. 312*—American cases.

In regard to powers of the people of a State, assembled in convention, it may be well to see what has been decided by the Supreme Court of the United States.

In the case of *Livingston v. Moore, 7 Peters, 546,* that court decreed "that the power of sovereignty existing in a republic resides in the people—not as individuals, but in their politic capacity; that the powers existing in every body politic, in forming a government, is distributed according to the will of the *sovereignty,* and in the *quantity* it *pleases,* and *imposes* what *checks* it pleases upon the public functionaries."

In the case of *The Bank of the United States v. Daniel, in 12 Peters, p. 33,* and in *13 Peters, 520; Charles v. Virgina, 6 Wheaton, 414; Craig v. Missouri, 4 Peters, 463;* and in *Ohio Life Insurance Company v. Debotts, 14 Howard, 428,* the Supreme Court held that the States of the Union were *sovereign within their own limits,* in all matters not surrendered in the Constitution to the Federal government.

In the case of *Dodge v. Worseley, 18 Howard, 349,* the Supreme Court held "that the constitution is supreme over all departments of the government, and anything done, unauthorized by it, is unlawful."

*Pike, Adams & Pike, English, Gantt & English,* for appellees.

As to the general right of recovery by the executors of Pointer, we respectfully submit to the consideration of the court the following cases, to wit:

A partition of an intestate's estate, consisting of land and

slaves, which was made and confirmed, without objections then taken, by the decree of a court of equity, in 1864, allowed only slaves to complainants, but no land. Held valid. *Slaves did not become free, either de jure or de facto, by the emancipation proclamation, in 1862. Pickett v. Wilkins, 13 Richards. S. C. Eq., 366.*

Emancipation is not a breach of covenant of warranty that slaves sold "are slaves for life," and is not a defense to notes given for the purchase money. The warranty was of the *status* of the slaves *at the time of sale*, not against a future act of government. *Hana v. Armstrong, 34 Ga., 232.* So of a warranty *"to be* slaves for life." *Bass v. Ware, ib. 386.*

A warranty on a sale of slaves, that they "are slaves for life," is not broken by their subsequent emancipation. Neither did the ordinance of emancipation affect such previous sale, but the vendor can recover the whole purchase money. *Bradford v. Jenkins, 41 Miss., 328; Polk, Adr. v. Pledge, 5 Coldwell, 389; Newman v. Stear, 5 Coldwell, 390.*

Compulsory payment of a debt to a receiver, under requisition acts of the Confederate government, is no defense to a suit brought for the same since the war, nor was the running of interest on such debt suspended during the war. *Shortridge v. Macon, U. S. circuit court, 1 Phillips N. C., 392.* See, also, *Brown's Executors v. Hawkins' Executors, 3 Bush. Ky. Reports, 558; Hughes v. Todd, 2 Duvall, 188.*

STORY, Special C. J.

In September, 1865, Pointer filed his bill against Pillow and Coolidge, in which he alleged that, on the 28th day of December, 1860, he sold to Pillow eighty-five negroes, which Pillow took into possession, for the sum of one hundred and nine thousand two hundred and six dollars and twenty-five cents, to secure the payment of which sum Pillow executed his four writings obligatory, payable on the first days of Januay, 1862, 1863–64 and '65, and on the same day executed, jointly with

Mary E. Pillow, his wife, a mortgage in favor of Pointer up-on two of his plantations, known as the "Defeat Cane" and "Lake" places, and forty-three of the slaves purchased of Pointer. Pointer further alleged that, on the 16th day of April, 1862, after the recording of the above mentioned mortgage, Pillow made a contract of sale with Henry P. Coolidge, whereby he sold to Coolidge his four plantations, known as "Defeat Cane," "Lake," "River," and "Mound" places, to-gether with all of his slaves, cotton and other personal prop-erty, for the sum of $575,000, which sum was payable in five equal installments, and for which Coolidge executed his five bills of exchange.

The contract recites that "there is a mortgage on the 'De-feat Cane' and 'Lake' places, and about forty-three of the negroes, in favor of John Pointer, of Giles county, Tennessee, for the purchase money of eighty-five of the negroes, which is on record in Phillips county. This sale is made subject to this mortgage and all of said Pillow's existing debts, which said Coolidge will pay out of the cotton crop now on hand, and subsequent crops, or out of the purchase money, and when so paid, the same will be credited to the purchase money due from said Coolidge, and allowed accordingly." Pointer also alleged, that the property covered by the mortgage of Pillow and wife to him, was not sufficient to pay the debt due from Pillow to him, the property having greatly depreciated in value during the war, and prays that Coolidge may be declared to be a trustee charged with the payment of all of Pillow's debts; that the stipulation of the 16th of April may be declared to be a lien in favor of the complainant, for the payment of the debt upon all of the property mentioned in the contract; that the defendants, or one of them, may be required to pay the debt; that the mortgage may be foreclosed, and the usual prayer for general relief.

Pillow filed his answer, in which he admits the purchase by him of eighty-five negroes from Pointer; that he gave a mort-gage, jointly with his wife, to secure the purchase money;

that a contract of sale of all his slave property, real estate, cotton on hand, etc., was made to Coolidge, and that it was recorded; but he denied that there was any intent to sell the property, or to make Coolidge a trustee for the benefit of his creditors, and alleged that it was intended to create in Coolidge an agency simply for the management of Pillow's property, and that there was no trust, either in fact or in law, created thereby, and in proof thereof, sets forth a duplicate of the stipulation of April 16, 1862, which contains the following additional provision: "This article of agreement witnesseth, that the said Pillow, or his heirs or legal representatives, may, at any time, purchase all said property so sold as aforesaid, by the re-delivery of said Coolidge's bills which he has executed for said purchase money; and when the said bills are returned and delivered to said Coolidge or his representatives, he obligates and binds himself, his heirs and legal representatives, to re-convey the same by deed or conveyance, cancelling the contract aforesaid; and Pillow hereby obligates himself, his heirs and legal representatives, neither to collect or demand the amount of said bills, or any part of them, and to return them for the purpose of cancelling said contract;" and the stipulation further provided that Coolidge should not be responsible for the slaves, but that he was to have the general care of all Pillow's property, and was to receive as "reasonable compensation as would be proper for an agent." Pillow further alleged that the duplicate of the contract of April 16, 1862, was made contemporaneous with the original, and supports this allegation by the testimony of a subscribing witness. Pillow also alleged that Pointer covenanted that the negroes sold by him to Pillow were slaves for life, and that the title was good; that the slaves were all lost by emancipation, and that there was, therefore, a total failure of consideration for the notes; that notes given for slaves were for a consideration which was illegal, and were, therefore, void.

Pillow pleaded, at a later term of the court, that he was a Confederate officer from the beginning to the end of the war;

that Pointer resided in Giles county, Tennessee, before and during the war, and that that part of Tennessee was within the Federal lines from May, 1862, to the end of the war.

Coolidge filed an answer and cross-bill, in which he alleged that the contract of April 16, 1862, was not intended for a sale, but simply to create an agency in him for the management of Pillow's property; alleged the contemporaneous execution of the duplicate contract, with the additional provisions, as we have given them above, and prayed that said contract might be annulled, the bills re-delivered, and that if the court should hold that a trust had been created, it should attach to the lands described in said contract, and not upon the supposed debt due to Pillow from him.

At the fall term, 1865, the death of Pointer was suggested, and suit was revived in the name of Brown & Childress, as executors of Pointer, deceased. The chancellor decreed a foreclosure of the mortgage, with an abatement of interest during a part of the war, and that the two articles of April 16, 1862, and five bills of exchange be delivered up and cancelled. Both parties appealed. The questions for consideration are:

*First.* The power of the courts to adjudicate upon this class of contracts.

*Second.* Did slavery exist simply by force of the positive laws of the States, having no power outside of the limits of the States, except so far as enforced by the Federal Constitution, being recognized as purely a right of the State, and not protected by the Constitution of the United States, except on demand of the State, evidenced by existing laws, and therefore not within the provision of the Federal Constitution, prohibiting States from impairing the obligation of contracts?

*Third.* Is Pillow entitled to an abatement of interest during the war?

*Fourth.* The effect of the two articles of April 16, 1862.

The first and second questions have been passed upon by the court in *Jacoway v. Denton,* and later cases, and whatever may be the individual opinion of the special judge, it is proper, in

the midst of ever recurring conflict of opinion, to adopt the rule of *Stare decisis*.

A question of some difficulty is presented by the allegation in Pillow's cross-bill, that Pointer resided, during the entire war, inside of the Federal lines, and that he, Pillow, was a Confederate officer, residing inside of the Confederate lines, and prays for abatement of interest for that period of time.

This question first arose in the United States shortly after the war of 1776, and it was held that on contracts made before the war, where the parties belong within the opposing forces, the debt was suspended, and that interest did not run unless the creditor enemy, either in person or by agent, placed it within the lawful power of the debtor to pay the debt.

This position was very ably vindicated by Mr. Jefferson, then secretary of State, in his celebrated reply to Mr. Hammond, the British minister plenipotentiary, and has been repeatedly confirmed by later decisions, made by the United States circuit courts and courts of the different States. In France, early in the seventeenth century, it was held that during a war prescriptions did not run, and that impossibility of communication, caused by the war, excused a failure to protest a bill of exchange. The Supreme Court of the United States say that the time during which the courts in the lately rebellious States were closed to citizens of loyal States, is, in suits brought by them since the war, to be excluded from the computation of the time fixed by the statute of limitations within which suits may be brought. It is true that the learned judge in that case remarked, that unless the rule be so, then the citizens of a State may pay their debts by entering into an insurrection or rebellion against the government of the Union, if they are able to close the courts, and to successfully resist the laws until the bar of the statute becomes complete; and it is urged upon us here, that to refuse to allow interest, during the time the parties were separated by the opposing forces, is to punish Pointer for his loyalty, and to reward Pillow for having engaged in a rebellion against the Federal government.

In reply to this, we must say that we do not consider the argument as sound that finds a person liable to *the citizens* of an opposing power, on account of the individual influence he may have had in determining the policy of his government, for such would be the result, if we should hold to the rule as advocated by counsel. In other words, if there is any principle of law whereby debtors, who are separated from their creditors by opposing forces, are remitted from the payment of interest during that time, then it surely will not be insisted, that because Pillow was a Confederate officer, he is outside of that principle. Pillow was responsible to the Federal government, and not to her citizens, for his course during the late rebellion. The Supreme Court of the United States, in a late decision, held that the rule that interest is not recoverable on debts between alien enemies, during a war between their respective countries, (if applicable under any circumstances to citizens of the States in rebellion and citizens of the States adhering to the national government,) does not apply where there is a known agent, appointed to receive the money, resident within the same jurisdiction as the debtor. Chief Justice Chase, in *Shortlege v. Mason*, held that interest should be allowed, but afterwards, in *Bigler v. Waller*, refused it. The decisions are conflicting, being evidently based upon the apparent equities of the different cases, and it is difficult to discover any general principle running through all.

During war all intercourse between enemies are prohibited, and wherever the law forbids a party from doing an act, not *malum in se*, nor, at the time of entering into the agreement to do the act, *malum prohibitum*, it excuses him from all penalties arising from a failure to perform his contract. This, we think, furnishes a just reason for the abatement of interest, during war, on debts due to the subjects of a belligerent power, from the time the party is entitled to make payment, which would only be at and after maturity, until the return of peace. The principle is a general one and may be stated in these words: Whenever the debtor, without fault on his part, is prevented

from paying the debt, at and after maturity, through the act of the creditor or the law, interest should be abated during the time he is so prevented. It is the duty of the debtor to seek his creditor and to pay his debt. He must show by affirmative proof that it was not through his neglect, accident or misfortune, the debt was not paid at maturity; that he was ready and willing to pay, but that through the act of the creditor or the law, he was prevented. *Hoare v. Allen,* 2 *Dallas, 102; Bouvier Law, Dic. Int.,s. 12 and 18; Yeaton v. Berney, 3 Legal New. 82; Bigler v. Waller, Ib. 26; Conn. v. Penn, 1 Pet. c. c. 496; Ward v. Smith, 7 Wal. 452.* Pillow has shown no effort to comply with the terms of this contract, and under the above rule is not entitled to an abatement of interest. Pointer prays that the recorded articles of April 16, 1862, may be held to be a conveyance, in trust, for the benefit of the creditors of Pillow, while both Pillow and Coolidge pray that the two articles may be construed together as one entire agreement— that said contract may be annulled and the bills re-delivered.

It is well settled that "when a transaction is endorsed by two papers, the connection between which is established by their contents, without any necessity of referring to other matter to connect them together, they will be taken as one entire agreement." Clearly, both of these articles are, under this rule of law, to be construed together. They both refer to the same subject matter—bear date on the same day—were evidently intended, by the contracting parties, to be construed together, and were undoubtedly made for the purpose alleged in the answer of Pillow and cross bill of Coolidge, viz: to create a secret agency in Coolidge for the management of Pillow's estate. Trusts are either express or implied. Express trusts are those which are created by the direct and positive acts of the parties, by some writing, or deed, or will. Construing the two articles of April 16, 1862, together, it is evident that an express trust was not created. Implied trusts are those "which are deducible from the nature of the transaction, as a matter of clear intention, although not found in the words of the parties,

*or which are superinduced upon the transaction by operation of law, as matter of equity, independent of the particular intention of the parties.*" A trust is never presumed or implied, as intended by the parties, unless taking all of the circumstances together, that is the fair and reasonable interpretation of the acts and transactions, except it be forced upon the conscience of the party by operation of law, on account of some meditated fraud, imposition, notice of an adverse equity, or other cases of a similar nature. We think a fair construction of the two articles will show that it was contrary to the intention of either Pillow or Coolidge to create a trust, and the only serious question for us to pass upon, is, whether Pointer has been so misled and injured by the recording of the first article or stipulation of April 16, 1862, that to refuse to declare it created a trust in Coolidge for the payment of Pillow's debts, would operate as a fraud upon the rights of Pointer. We cannot discover, from a careful examination of the bill, that he has been thus injured, and we know of no reason why the prayer of Coolidge should not be granted. *Nick's heirs et al. v. Rector, 4 Ark. 278; Story's Eq. Jurisprudence, s. 980 and 1195.*

It is therefore considered that the decree of the court below be set aside; that the mortgage be foreclosed and the property sold—that the plaintiffs recover the amount of said notes and interest, and that the two stipulations of April 16, 1862, and the five bills of exchange, given by Coolidge to Pillow, be delivered up and cancelled, and that a decree be entered in this court accordingly.

McCLURE, J., dissenting.

In the majority opinion four questions are presented and determined. Of the third and fourth I shall not speak. The first and second propositions, and the manner in which they are disposed of, by the majority, are among the things which have led to this dissent, and in order that they may be the

more readily understood, I shall insert them at length.   They are as follows:

*First.*  "The power of the courts to adjudicate upon this class of contracts."

*Second.*  "Did slavery exist simply by force of the positive law of the States, having no power outside of the limits of the State, except so far as enforced by the Federal Constitution, being recognized as purely a right of the State and not protected by the Constitution of the United States, except on demand of the State, evidenced by existing laws, and therefore not within the provision of the Federal Constitution prohibiting a State from impairing the obligation of contracts?"  In disposing of these important questions, the majority of the court say: "The first and second questions have been passed upon by this court in *Jackoway v. Denton,* (*25 Ark. 625,*) and later cases, and whatever may be the individual opinion of the special judge, it is proper in the midst of ever recurring conflict of opinion, to adopt the rule of *stare decises.*"

It is true that a majority of the court held, in *Jackoway v. Denton,* (*25 Ark. 625,*) that section fourteen, of article 15 of the Constitution of this State, was in conflict with that clause of the Constitution of the United States, which declares "no State shall pass any law impairing the obligation of contracts."

If the facts in this case were similar to those presented to the court in *Jackoway v. Denton,* (*25 Ark. 625,*) there might be some excuse for adopting what is called the rule of *stare decises;* but they are not; they are as different as night is from day; there is no similarity between the two cases, save that the consideration, for which the notes were given, was negro slaves. Jackoway and Denton were both citizens of the State of Arkansas, at the giving of the note and at the commencement of the suit, and while the court might well hold that a denial of the use of the courts of the State to citizens of the State, was an infringement upon the contract, and an impairing of its obligation; it does not follow that citizens of *other States* can come into the courts of this State and use them to enforce con-

tracts made in other States, the enforcement of which are forbidden in positive terms by our own Constitution.

The record in this case shows that the sole consideration of the contract, sought to be enforced, was for the purchase of slaves. It also shows that the contract was *not* made in the State of *Arkansas* but in the *State of Tennessee.*

The theory advanced by the majority in relation to contracts, is, that "the laws in existence when it is made are referred to in all contracts, and form a part of them." Although a strict adherence to this doctrine would render our laws, for the enforcement of debts, somewhat similar to those of the Medes and Persians, unchangeable—we have yet to hear of a jurist, who has asserted that the laws of Arkansas, and thirty-five other States of the Union, for the collection of debts, enter into every contract made and executed in the State of Tennessee, until the opinion was rendered in this case. In the case now under consideration, the majority have declared that the citizens of *other States*, at the time of making contracts, have a vested right to a remedy to enforce their contracts in the courts of every State of the Union, and that a denial of such a right, to the citizens of other States, would amount to an impairing of the obligation of the contract. From such a conclusion I must respectfully dissent.

I have stated that the record in this case shows that neither Pointer or Pillow were citizens of the State of Arkansas, at the time of the making of the contract; but, on the contrary, that they were both citizens of the State of Tennessee. Our Constitution declares that "no court of this State shall take cognizance of any suit founded on such contracts," *i. e.* that no court of this State shall take any cognizance of any suit to enforce a contract, the consideration of which grew out of the purchase of slaves. The record in the case shows that the consideration which moved Pillow to the execution of the notes sued on, was for the purchase of negro slaves. In *Jackoway v. Denton*, (*25 Ark. 625*,) the majority of the court held (Jackoway and Denton both being citizens of the State of Ar-

kansas,) that a denial of *jurisdiction*, in that instance, amounted to a denial of *remedy*, and therefore impaired the obligation, of what once was a valid contract. If it be admitted that the sovereign people had not the same power, when in convention assembled, to destroy the *right of property* in a *note*, the consideration of which was for the purchase of slaves, as to destroy *the right* of *property* in *slaves*, I am willing to admit that the closing of the doors of courts against slave contracts, impaired the contract, if it be true that the laws in existence at the time of its creation entered into its possessions and became a part thereof. But does it follow, either as a logical sequence, or a legal deduction, because the laws in Arkansas, at the time a contract is made, become a part thereof for its enforcement, that these same laws entered into and became a part and parcel of the contracts entered into in the State of Tennessee? The majority of the court seem to be of opinion, and in fact many of the citizens of Tennessee agree with them on this point, that the people of Tennessee can make just such contracts as they choose, and that the people of Arkansas have no right to prohibit the use of her courts to enforce Tennessee contracts.

It may be a fault of my education, but I have ever been taught to believe that every State is perfectly competent, and has the exclusive right to prescribe remedies in its own judicial tribunals; to limit the time, as well as the mode of redress, and to deny their *jurisdiction* over cases which its own *policy* or judgment might discountenance; and I have also been taught to believe, from repeated adjudications, and the American text writers, as well as those of England, that the right of citizens of one State or Kingdom, to sue in another, was not in fact, a matter of *"right,"* but a thing of *comity.*

Story, on the conflict of laws, (sec. 18,) says: "A *State* may regulate the manner and circumstances under which property, whether *real* or *personal*, or in *action*, shall be held, transmitted, bequeathed, transferred or enforced; the condition, capacity and state of all persons within it; the *validity of contracts* and

other acts done within it; the resulting rights and duties growing out of these contracts and acts." The State of Arkansas has undertaken to pass on the *validity* of slave contracts. Judge Story says that a State may not only do this, but it may regulate the manner and circumstances under which *property*, whether real or personal, may be held. The majority of the court take issue with Judge Story, on this point, and deny the doctrine laid down by him; but candor compels me to say that his reasoning has carried stronger convictions to my mind, in favor of his theory, than the argument presented by the majority.

Continuing, Judge Story says: (sec. 242,) "Generally speaking, the validity of a contract is to be decided by the law of the place where it is made, unless it is to be performed in another country." This contract (the payment of the money mentioned in the notes) was to be performed *in Tennessee*, and I will admit that it was a legal and valid contract at the time of its execution. The view I take of this matter is, not whether it was a legal obligation *then*, or whether it is *now*. These questions are foreign to what I regard as the *real* issue. The question which presents itself to my mind is, can the courts of this State enforce contracts for the sale or purchase of slaves, made and to be performed in other States, when the Constitution of this State declares in plain and emphatic terms that they shall not?

There is a well defined rule of construction, running through all the books of the profession, that every word, line and sentence, in a Constitution or law, should receive such construction as would place some meaning upon each word, line and sentence, rather than resort to a construction which would render words and whole lines and sentences nullities, or meaningless phrases. In *Jackoway v. Denton, (25 Ark. 625,)* the court declared that a recognition of the force and effect of section fourteen, of article fifteen, of the Constitution of this State, *in that case*, would be in conflict with that provision of the Constitution of the United States, which declares that "no

State shall pass any law impairing the obligation of contracts;" but is that true of this case? I think not; for the provision of the fourteenth section, of article fifteen, which declares that "no court, of this State, shall take cognizance of any suit founded on such (slave) contracts," if given its full operation, force and effect, would not deprive Pointer of a remedy to enforce his contract with Pillow. It may well be argued that Jackoway and Denton, both being citizens of Arkansas, were deprived of a court in which to enforce their contract, when the doors of the State court was closed against them; but this is not true as to Pointer and Pillow, and for this reason, the opinion in *Jackoway v. Denton*, (*25 Ark. 625,*) is not applicable to the state of facts existing in this case; nor can it, with any degree of fairness, be claimed that the rule of *stare decises* is applicable to this case. My convictions are, that the people of this State not only have the right and power to prohibit the use of their courts to enforce the contracts made by citizens of other States, in other States; and that the language of our Constitution is broad enough in its terms to deny to citizens of other States the use of our courts to enforce slave contracts, I have no doubt. Entertaining these convictions, as I do, I have briefly referred to a few of the points which have led to my dissent.

The right of citizens of other States to sue in the courts of this State, is, as laid down by all law writers, a matter of *comity*, which the State may either extend or deny. Our State, in my opinion, by the language employed in section fourteen, of article fifteen, has denied the use of the courts to the enforcement of slave contracts; and while I might be willing to assent to a decision where its enforcement would come in conflict with that provision of the Constitution of the United States, which prohibits a State from passing a law impairing the obligation of a contract, I am unwilling to extend it to a class of cases where neither the facts nor the surroundings of the case raises the point raised in *Jackoway v. Denton*.

Gregg, J., dissenting, says:

We concur in the conclusions of law, arrived at by the special judge in this case, but we do not concur in all the statements made, or propositions defined and argued.

Wilshire, C. J., being disqualified did not sit in this case.

Hon. Wm. Story, Special C. J.