BUCKNER (ESTHER v.). See Case No. 4,-537.

BUCKNER v. JEWELL. See Case No. 3,-060.

BUCKNER (McCORMICK v.). See Case No. 8,718.

BUCKNER (MORRISON v.). See Case No. 9,844.

---

# Case No. 2,098.
## BUCKNER v. STREET.

[1 Dill. 248;[1] 13 Int. Rev. Rec. 114; 7 N. B. R. 255.]

Circuit Court, E. D. Arkansas. 1871.

SLAVERY—SLAVE CONTRACTS—THIRTEENTH AMENDMENT.

1. Contracts for the purchase and sale of slaves are against sound morals, natural right, and have no validity unless sanctioned by positive law.

2. A remedy on such contracts may exist by virtue of the positive law under which they were made, but such remedy can only be enforced so long as that law remains in force.

3. The thirteenth article of amendment to the constitution of the United States repealed all laws sanctioning slavery, and the traffic in slaves and the right of action on slave contracts does not survive such repeal, founded as it is on the supreme authority of the people of the United States.

4. The rule that statutes should not receive an interpretation that will give them a retrospective operation, so as to divest vested rights of property, and perfect rights of action, has no application, so far as relates to slaves and slave contracts, in the construction of the thirteenth article of amendment of the constitution of the United States.

[In bankruptcy. Henry S. Buckner against W. B. Street, assignee of Walter Sessions, a bankrupt.]

C. H. Carlton, for plaintiff.
W. B. Street, in pro. per.

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

CALDWELL, District Judge. In Osborn v. Nicholson [Case No. 10,595], this court held that slave contracts derived all their obligation from the constitution and laws of the states in which they were made; that the only sanction or validity they had was by virtue of these laws; that the common law would not afford a remedy on such contracts, and that the abolishment of slavery by the thirteenth article of amendment of the constitution of the United States had the effect to repeal these laws, and that the repeal left the holders of such contracts without a remedy. The soundness of this position is questioned, and I propose briefly to review it.

It is conceded that a state cannot pass any law impairing the obligation of any contract, into which it has entered, nor can it pass any law impairing the obligation of any contracts between individuals.

There are qualifications to this general principle, which were pointed out in Osborn v. Nicholson. And a state can no more impair the obligation of its own or individual contracts, by the repeal of the statute under which they were made, than by an affirmative act declaring them void.

But upon what ground were the judgments in the cases establishing these principles rested? Upon the sole ground that such legislation on the part of the state would be in conflict with that clause of the constitution prohibiting states from passing laws impairing the obligation of contracts. But for that constitutional provision, would or could the courts have rendered the judgments they did render in these cases?

The opinions of the judges in the numerous cases that affirm these principles afford a conclusive and satisfactory answer to this question.

Now, by what authority were the laws sanctioning slavery and the traffic in slaves repealed? By an amendment to the constitution of the United States, adopted by the people of the United States, and founded on their supreme authority. The moment it was adopted it became a fundamental law, of absolute, paramount obligation. If any state law or constitution, or any provision of the constitution of the United States, previously existing, conflicted directly or by fair implication with its provisions, it was repealed and abrogated. Has it ever been pretended that the limitation of the powers of the states were also limitations on the powers of the whole people of the United States, when acting in their aggregate, sovereign capacity in amending or altering their constitution of government?

The inhibition to pass laws impairing the obligation of contracts is limited to the states. They are, but the national government is not, prohibited from passing such laws. "No state can impair the obligations of a contract; but this inhibition does not apply to the general government." Bloomer v. Stolley [Case No. 1,559].

"There is nothing in the constitution of the United States which forbids congress to pass laws violating the obligation of contracts, although such a power is denied to the states individually." Evans v. Eaton [Case No. 4,559], and in Hepburn v. Griswold, 8 Wall. [75 U. S.] 637, in answer to the objection that the legal tender act impaired the obligation of contracts, Mr. Justice Miller says: "Undoubtedly it is a law impairing the obligation of contracts made before its passage. But while the constitution forbids the states to pass such laws it does not forbid congress."

And the congress of the United States passed laws annulling treaties, which are the most solemn form of contracts that the government can make; and the validity of such acts has always been maintained. Webster v. Reid, Morris (Iowa) 467; Taylor v. Morton [Case No. 13,799]; Gray v. Clinton Bridge [Id. 2,900]; U. S. v. Tobacco Factory [Id. 16,528], affirmed 11 Wall. [78 U. S.] 616.

Under our constitution of government the people are the source of all power—they are the supreme power—and their will, when embodied in the form of a constitutional provision, is declared by the constitution itself to be "the supreme law of the land." It was this supreme law of the land that struck out of existence the laws sanctioning slavery, on which the slave dealer could alone rely to recover the fruits of his traffic.

Mr. Sedgwick says, the effects of the repeal of a statute, when it is clear and absolute, are of a very sweeping character. And after referring to the cases on that subject, he says: "It will be observed that the operation of the general rule is to give repealing statutes a very retroactive effect. * * * Efforts have been made to resist these results, and certain exceptions have been made to this retroactive application. The first is, that where a right, in the nature of a contract, has vested under the original statute, then the repeal does not disturb it. And in this country this principle is carried out and firmly established by the clause of the constitution of the United States, that no state can pass any law impairing the obligation of contracts."

Now, the soundness of this rule is not questioned, but its application to this case is denied. The repeal in this case was not by a state statute, nor yet by a law of congress, but by the thirteenth amendment to the constitution of the United States, which was the work of the sovereign people of the United States, on whose political and lawmaking powers there are no limitations, if we except those imposed by the Deity. They can divest vested rights, and annul and impair the obligation of contracts.

The impediment in the way of repealing acts passed by the states, having their legitimate and full operation on executory contracts, depending for their force and validity on the act repealed, does not obtain when

the repeal is effected by an amendment to the constitution of the United States.

Mr. Sedgwick says that when a right, in the nature of a contract, has vested under the original statute, then the repeal does not disturb it; and he cites in support of this: Fletcher v. Peck, 6 Cranch [10 U. S.] 87; Gillmore v. Shooter, 2 Mod. 310; Couch v. Jeffries, 4 Burrows, 2460; Churchill v. Crease, 2 Moore & P. 415; Terrington v. Hargreaves, 3 Moore & P. 137. "I have examined all these cases. Fletcher v. Peck, as we all know, was ruled upon the ground that the act of the Georgia legislature was repugnant to the clause of the constitution inhibiting states from passing laws impairing the obligation of contracts. All the English cases cited arose under positive enactments, and no question was made in any one of them as to the effect of a repealing statute, and they do no more than recognize the well settled rule, that an act of parliament cannot have a retrospective operation on past transactions, unless that intention is expressed, or appears by an unavoidable implication. In Couch v. Jeffries, Lord Mansfield, speaking of the intention of parliament, says: "They clearly meant future actions." The next and last case cited for this position is Butler v. Palmer, 1 Hill. 324. The opinion of Judge Cowen in this case is a learned and unanswerable argument in favor of the rule I have laid down. A few passages taken from his elaborate opinion will show this very conclusively. He quotes approvingly the language of Lord Chief Justice Tindal, in Key v. Goodwin, 4 Moore & P. 341, 351, where that learned judge said: "I take the effect of a repealing statute to be, to obliterate it (the statute repealed) as completely from the records of the parliament as if it had never passed, and that it must be considered as a law that never existed, except for the purpose of those actions or suits which were commenced, prosecuted, and concluded whilst it was an existing law." And he says: "A number of cases have been cited by the counsel for the defendant, and some very strong ones, to show that any enactment of the legislature annulling contracts, or creating new exceptions and defences, shall be so construed as not to affect contracts or rights of action existing at the time of the enactment." Here follow the cases cited by Mr. Sedgwick, and given above, and in addition, the case of Dash v. Van Kleeck, 7 Johns. 477. This last case will be noticed in another part of this opinion. He then says: "But these are all cases relating to positive enactments. None of them arose on a repealing clause; and they merely recognize the well settled rule, as laid down by Best. Chief Justice, in the late case of Terrington v. Hargreaves, viz.: 'That the provisions of a statute cannot have a retrospective or ex post facto operation, unless declared to be so by expressed words, or positive enactment.' Vide 3 Moore & P. 143.

But, both in that case, and Churchill v. Crease, an express provision was allowed to have such an operation. I know the rights of action, and other executory rights arising under a statute, are said to be vested. Couch v. Jeffries, 4 Burrows, 2462, and vide Beadleston v. Sprague, 6 Johns. 101. They are so, and a subsequent statute ought not to repeal them, though it may do so by express words, unless they amount to a contract within the meaning of the constitution. But that being out of the way" (and it is, when the repeal is effected as in this case by amendment to the constitution of the United States), "and the statute being simply repealed, the very stock on which they were engrafted is cut down, and there is no rule of construction under which they can be saved. * * * A right carried into judgment, or taking the form of an express executory contract under a repealed statute, might, perhaps, also stand on the same ground with the devise in Jenkins; and so of other rights having means of vitality independent of the statute. But, where everything depends on this, it seems to be equally a violation of principle as of authority to say, that any one of its provisions can be enforced or executed after it has been repealed by a general clause."

Slave contracts "have no means of vitality independent of the statute." Every one who asserts a right grounded on slavery, or rights under contracts growing out of that institution, must show an existing positive rule of law that authorizes him to assert and claim such rights. It cannot be asserted, under the common law derived from England, and incorporated into the jurisprudence of this country; for, by that law, slavery and slave contracts are held to be against sound morals and natural justice and right, and utterly illegal and void. Vide Lord Mansfield in Somerset's Case [Lofft. 68]; Forbes v. Cochrane, 2 Barn. & C. 448; Story, Confl. Laws, §§ 96, 242, 244, 259; Greenwood v. Curtis, 6 Mass. 361, opinion of Judge Sedgwick; Kauffman v. Oliver, 10 Barr [10 Pa. St.] 514; 2 Kent. Comm. 283 et seq.; opinion of Justices McLean and Curtis in the Dred Scott Case [19 How. (60 U. S.) 393]; Jones v. Vanzant [Case No. 7,501]; Marshall v. Baltimore & O. R. Co., 16 How. [57 U. S.] 314, 334; Bank of U. S. v. Owens, 2 Pet. [27 U. S.] 527. "Although the English law has recognized slavery, it has done so within certain limits only; and I deny that in any case an action has been held to be maintainable in the municipal courts of this country, founded upon a right arising out of slavery." Per Chief Justice Best, in Forbes v. Cochrane; and see opinion of this court in Osborn v. Nicholson.

The common law recognizes no vested right of action in, and will not uphold, contracts which are against good morals, religion, and natural right, and opposed to the

fundamental policy of the government. And such rights cannot now be asserted under the laws that gave sanction to slavery and slave contracts, for these laws, in the language of the court in Butler v. Palmer, "being simply repealed, the very stock on which they were engrafted is cut down, and there is no rule of construction, under which they can be saved." Butler v. Palmer, supra; Key v. Goodwin, supra; Norris v. Crocker, 13 How. [54 U. S.] 429; Kimbro v. Colgate [Case No. 7,778]; Moffitt v. Garr, 1 Black [66 U. S.] 273; Surtees v. Ellison, 9 Barn. & C. 752.

The fugitive slave law of 1793, as well as that of 1850, gave to slave owners a right of action against any person who should carry off, harbor, or conceal their slaves, and fixed the measure of damages in such cases. And these acts afforded to slave owners ·the only remedy they had in such cases outside of the slave states. Jones v. Vanzant, supra; Kauffman v. Oliver, supra; Prigg v. Pennsylvania, 16 Pet. [41 U. S.] 611; and see fugitive slave acts of 1793 and 1850 [1 Stat. 305 and 9 Stat. 464].

Yet, when a right of action accrued for carrying off, harboring, and concealing slaves, under the act of 1793, and suit was brought for damages fixed by that act, and was pending when that act was repealed by the act of 1850, it was held that the action fell with the repeal of the statute (Norris v. Crocker, 13 How. [54 U. S.] 429) thus leaving slave owners, whose slaves had ʋeen wrongfully taken from them, remediless.

Now, certainly one whose property is wrongfully taken from him, and lost or destroyed by another, is upon every principle of justice and right as much entitled to compensation for the value of the property, so wrongfully taken, and to a remedy to recover that value, as he is to a remedy to recover the agreed value of property from one to whom he may have sold it. And on principle and reason, is there not just as much ground to declaim against a rule of construction that takes away the right of action in the one case as the other?

States may pass retrospective or retroactive laws that will divest antecedent vested rights of property, if they do not technically impair the obligation of contracts. Calder v. Bull, 3 Dall. [3 U. S.] 388; Watson v. Mercer, 8 Pet. [33 U. S.] 110; Baltimore & S. R. Co. v. Nesbit, 10 How. [51 U. S.] 402; Satterlee v. Matthewson, 2 Pet. [27 U. S.] 380.

Such laws would seem as obnoxious on principle as laws that impair the obligation of contracts. But in the one case they are held valid, because there is no limitation on the power of the states to pass retroactive laws, and in the other void, because there is a limitation on the states that prevents them from passing laws impairing the obligation of contracts.

The fifth amendment to the constitution of the United States declares that no person shall be "deprived of life, liberty, or property without due process of law." And the supreme court of the United States has said that by the constitution of the United States, and of all the states of the Union, as well as by the universal law of all free governments, private property can be taken for public use only upon making to the owner just compensation. And yet we know that the right of property in all the slaves within the jurisdiction of the United States was destroyed by this amendment, without compensation.

Is the right of the people of the United States to do this thing questioned? It could be questioned only on the grounds advanced by Lord Coke, in Bonham's Case [8 Coke, 114a], that the common law controlled acts of parliament, and adjudged them void when against common right and reason. But all the judges since his time have said it was for parliament and the king to judge what common right and reason was; and Lord Campbell styles what was said by Lord Coke in this case, "nonsense still quoted by silly people." 2 Camp. Lives Ld. Ch. 372, 373, and note; 1 Camp. Ch. Just. 290.

A stronger epithet than that applied by the lord chancellor to those who quote Lord Coke's dictum in Bonham's Case as authority, might justly be applied to those who question the power and authority of the people of the United States, by amendment of their constitution of government, to abolish slavery and obliterate all rights depending for their validity and enforcement on slave codes. They have done it, and how is their action to be justified to the slave owner and all others affected by it, and to the world? Upon the ground that slavery was founded ·in force and violence, and contrary to natural right; that the right of the slave to his freedom was paramount to the claim of his master to treat him as property; that no vested right of property or action could arise out of a relation thus created, and which was ·an ever new and active violation of the law of nature, and the inalienable rights of man, every moment that it subsisted. It was not as was held in Jacoway v. Denton, 25 Ark. 625, a revolutionary measure. It was the work of the sovereign people of the United States, for the purpose of conforming their constitution and laws to the immutable principles of eternal justice. And, to liken the right of property in a human being to the right of property in a chattel, and a right of action for the price of a human being to the right of action for the price of a chattel, is to confound all distinction between right and wrong. Was the right of property in slaves less sacred, and any more beyond the reach of that amendment, than a right of action based on a slave contract? If A purchased from B a slave, and gave his note for the agreed price, was not A's right of property in the

slave upon every principle of law and ethics as sacred and as much entitled to protection as B's right of action on the note given for the slave? Did not the right of property in the one case, and the right of action in the other, grow out of the same transaction? and did they not in both cases depend for their validity and enforcement on the same laws? And when those laws were abolished, did they not both fall together? Is the amendment effectual to destroy the substance, but not the shadow? To destroy or preserve the one is to destroy or preserve the other.

In Osborn v. Bank of U. S., 9 Wheat. [22 U. S.] 866, Chief Justice Marshall says: "It is not unusual for a legislative act to involve consequences which are not expressed;" and this is true of a repealing statute in a greater degree than in any other form of statute, but it applies with greater force to a constitutional provision operating as a repealing statute, than to a law in any other form.

A constitution is a fundamental and paramount law, and its operation and effect cannot be limited or controlled by previous laws or constitutions in conflict with it, nor by any previous policy of the government. The thirteenth and fourteenth amendments are a denunciation of slavery in all its forms. The relation of master and slave is destroyed; the former slave is made a citizen of the republic; the buying and selling of men is denounced; the slave is taken from one who purchased him and held him under a contract, warranting that he was a slave for life, and this is done without making compensation to the owner, and without giving him a right of action on his warranty; and the slave-dealer is left without a slave code, under and by virtue of which alone contracts growing out of that traffic can be enforced. All these consequences are necessarily implied in these amendments, and "what is implied in a statute is as much a part of it as what is expressed." U. S. v. Babbit, 1 Black [66 U. S.] 61; Gelpcke v. City of Dubuque, 1 Wall. [68 U. S.] 222.

And this retrospective operation of the amendments, and the results that flow legitimately from them, are not to be avoided by considerations of inconvenience and hardship. It might be argued that the thirteenth amendment did not divest the right of property in slaves in being held and possessed as property at the time of its adoption.

If a provision, in the same words, was found in a state statute, it might very plausibly be contended that it must be presumed the legislature did not intend to divest and destroy existing rights of property without compensation, and that it must therefore be restricted to slaves coming into being after the passage of the act, and we know that authorities would not be wanting to support such a construction. Why attempt to apply the rules for the construc-

tion of statutes divesting vested rights, and impairing the obligation of contracts, to one consequence of the amendment more than to another?

"In construing the language of a constitution, we have nothing to do with the argument ab inconvenienti for the purpose of contracting or enlarging its import, the only sound principle being to declare 'ita lex scripta est,' to follow and to obey." People v. Morrell, 21 Wend. 584. And in the matter of Oliver Lee & Co.'s Bank, 21 N. Y. 9, Judge Denio, speaking of the court of appeals, says: "But we are not to interpret the constitution precisely as we would an act of the legislature. The convention was not obliged, like legislative bodies, to look carefully to the preservation of vested rights. It was competent to deal, subject to the ratification of the people, and the constitution of the federal government, with all private and social rights, and with all the existing laws and institutions of the state. If the convention had so willed, and the people had concurred, all former charters and grants might have been annihilated. When, therefore, we are seeking for the true construction of a constitutional provision, we are contantly to bear in mind that its authors were not executing a delegated authority, limited by other constitutional restraints, but are to look upon them as the founders of a state, intent only upon establishing such principles as seemed best calculated to produce good government and promote the public happiness, at the expense of any and all existing institutions which might stand in their way. The rule laid down in Dash v. Van Kleeck, 7 Johns. 477, and other cases of that class, by which courts are admonished to avoid, if possible, such an interpretation as would give a statute a retrospective operation, have but a limited application, if any, to the construction of a constitution." And the court in this case held the provision of the constitution of 1846, of the state of New York, subjecting the stockholders of banks to personal liability, to be retrospective in its operation, and subjected stockholders of banks to liability who were exempted from personal liability by their articles of association, adopted and in force when this constitutional provision went into effect. The whole opinion in this case is learned and instructive, and fully supports the ruling here made. The court was undoubtedly right in holding that the rule with reference to giving a statute a retrospective operation on past transactions has but a limited application, if any, to the construction of a state constitution; and it has none at all in the construction of the thirteenth article of amendment of the constitution of the United States; upon the operation of which, retrospectively as well as prospectively, there is not, and cannot be in the nature of things, any limitation.

And this principle of giving a retrospective

effect to a constitutional amendment was recognized by the supreme court at a very early day.

In Chisholm v. Georgia, 2 Dall. [2 U. S.] 419, the supreme court decided that a state could be sued by an individual citizen of another state. This decision induced the adoption of the eleventh amendment to the constitution, declaring that the judicial power of the United States should not extend to such cases. When this amendment was adopted, suits were pending in the supreme court against states, brought by citizens of other states. It was contended that the jurisdiction of the court was unimpaired in relation to all suits instituted previous to the adoption of the amendment. But the court was unanimous in holding, that after the adoption of the amendment, it could not exercise jurisdiction in any case, past, present, or future. Hollingsworth v. Virginia, 3 Dall. [3 U. S.] 378. In the opinion in support of this jurisdiction (Chisholm v. Georgia, supra) Justice Cushing uses this language: "The right of individuals, and the justice due to them, are as dear and precious as those of the states. Indeed, the latter are founded upon the former, and the great end and object of them must be to secure and support the rights of ●individuals, or else vain is government." The precious right here spoken of, was the right to coerce a state by suit to comply with the obligation of her contract; but as precious as this act was, the court held the eleventh amendment divested them of jurisdiction in all cases, past and future, thus giving a retrospective effect to the amendment, and leaving the creditors of states remediless. The thirteenth amendment works the same result on all slave contracts. This amendment is remedial in its nature, and, according to settled canons of construction, must be so construed as to suppress the whole mischief.

The rule that when a perfect right of action has accrued on a contract, authorized by statute, a repeal of the statute does not affect it (Pacific Mail S. S. Co. v. Joliffe, 2 Wall. [69 U. S.] 450) must rest for its support on one of these two grounds: (1) That to give the repealing statute that effect would impair the obligation of a contract, and make it obnoxious to the constitutional provisions prohibiting states from passing such laws; or (2) That the right of action on the contract being perfect before the repeal, the common law will afford a remedy independent of the statute. As to the first ground, we have seen that it does not apply when the repeal is effected by the sovereign power of the nation. And the second has no application when the contract, though valid by the law when made, is in its nature inherently vicious and contrary to sound morals and natural justice and right, and to the fundamental policy of the government. All remedies are given by virtue of some law. Under what law can the slave dealer assert his right of action? Not under the laws that sanctioned the right, for they are abolished. He must then seek it under the common law: But the common law brands all such contracts as vicious, immoral, contrary to the law of nature, and void.

And the moment the positive authority of the laws, under which such contracts were made, was removed by their repeal, the common law seized upon them and stamped them as illegal and void. Osborne v. Nicholson, supra.

It was not so in Pacific Mail S. S. Co. v. Joliffe, supra. There the contract was one that the parties might have made independently of the statute, and one that the common law would have enforced, and that it did enforce, independent of the statute. But a positive law giving and enforcing the right of action on a slave contract is as necessary to its vitality as air is to human life, and such right can no more survive the repeal of such positive law by the thirteenth amendment, than a human being can live without air.